## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## EASTERN DIVISION

THOMAS FOSTER,

                  Claimant,

vs.

KILOLO KIJAKAZI,
ACTING COMMISSIONER OF
SOCIAL SECURITY,[1]

                  Defendant.

No. 20-CV-2058-LRR

**REPORT AND
RECOMMENDATION**

---

Thomas Foster ("Claimant") seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. Sections 401-34. Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that he was not disabled. For the reasons that follow, I recommend that the Commissioner's decision be **affirmed in part and reversed and remanded in part**.

## I.    BACKGROUND

I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 12) and only summarize the pertinent facts here. Claimant was born January 8, 1960. (AR[2] at 19.) Claimant has at least a high school education and is able to communicate in English.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Acting Commissioner Kilolo Kijakazi is substituted for Commissioner Andrew M. Saul as the defendant in this suit.
[2] "AR" cites refer to pages in the Administrative Record.

(*Id.*)  He allegedly became disabled due to post traumatic stress disorder ("PTSD"), "PTSD following military combat," anxiety related to stress, and depression.  (*Id.* at 199.)  Claimant's onset of disability date was July 13, 2017.  (*Id.* at 10.)  Claimant filed his application for DIB on November 14, 2017.  (*Id.*)  His claims were denied originally and on reconsideration.  (*Id.* at 101-04, 106-09.)  A video hearing was held on July 22, 2019, with Claimant and his attorney Benjamin R. Roth in Waterloo, Iowa and ALJ Michael Lee Larner and vocational expert ("VE") Carma A. Mitchell in West Des Moines, Iowa.  (*Id.* at 33-56.)  Claimant and the VE testified.  (*Id.* at 37-55.)  The ALJ issued an unfavorable decision on August 8, 2019.  (*Id.* at 10-20.)

Claimant requested review and the Appeals Council denied review on April 1, 2020.  (*Id.* at 1-5.)  Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner.  *See* 20 C.F.R. § 416.1481.

On June 3, 2020, Claimant timely filed his complaint in this Court.  (Doc. 1.)  On July 23, 2021, briefing deadlines expired and the Honorable Linda R. Reade referred the case to me for a Report and Recommendation.

## II.  *DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF*

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant has a disability when, due to physical or mental impairments, the claimant

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 416.920(c). The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quoting 20 C.F.R. §§ 404.1521(b), 416.921(b)). These include

> (1) physical functions such as walking, standing, sitting, lifting, pushing,
> pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing,
> and speaking; (3) understanding, carrying out, and remembering simple

instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Id.* (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999) (quotation omitted).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to this application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 416.960(b)(1). If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id.* §§ 416.920(a)(4)(v), 416.960(c)(2). The ALJ must show not only that the claimant's

4

RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

**A.    *The ALJ'S Findings***

The ALJ made the following findings regarding Claimant's disability status at each step of the five-step process. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since his alleged onset of disability date of July 13, 2017. (AR at 12.)

At step two, the ALJ found that Claimant suffered from the following severe impairments: PTSD, depression, and anxiety. (*Id.*) The ALJ found Claimant's hernia to be a nonsevere impairment. (*Id.*)

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment listed in the regulations, either when considered singly or in combination. (*Id.*) The ALJ evaluated Claimant's claims under listings 12.04 (depressive, bipolar and related disorders); 12.06 (anxiety and obsessive compulsive disorders); and 12.15 (trauma- and stressor-related disorders). (*Id.* at 13-14.)

At step four, the ALJ found that Claimant had the following RFC:

[T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the ability to understand, remember, and complete only simple, routine tasks; no more than occasional interaction with co-workers and supervisors; no work-related interaction with the public; and no more than simple changes in the work setting.

(*Id.* at 14.)  The ALJ also found that Claimant was unable to perform any of his past relevant work because his RFC limited him to "unskilled work."[3]  (*Id.* at 19.)  At step five, the ALJ found there were jobs that existed in significant numbers in the national economy Claimant could perform, including packaging machine operator, machine feeder, and cook's helper.  (*Id.* at 20.)  Therefore, the ALJ concluded that Claimant was not disabled.  (*Id.*)

## B.    *The Substantial Evidence Standard*

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole."  *Moore*, 572 F.3d at 522.  "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law. . . . [T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotations omitted).  Thus, a court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case.  *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted).  The decision is not outside that zone of choice simply because the court might have reached a different decision.  *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision.

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence.  *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005).  A court considers both evidence that

_____

[3] I note that the ALJ stated several times in the decision that Claimant was limited to performing unskilled work (AR at 15, 16, 18, 19, 20), but did not use the term "unskilled work" in the RFC.  This apparent discrepancy is discussed in part III.F, *infra*.

supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

## III. DISCUSSION

Claimant alleges the ALJ committed reversible error by (A) failing to articulate how persuasive he found the opinions of the Veterans Administration ("VA") Compensation and Pension psychiatrist; (B) failing to articulate how persuasive he found the opinions of the state agency reviewing psychiatrists; (C) failing to provide sufficient reasons for finding Dr. Maassen's and Dr. Conditt's opinions unpersuasive; (D) failing to provide sufficient reasons for finding the opinions of Dr. Laura McDonald unpersuasive; (E) failing to provide good reasons for finding Claimant was not credibly reporting his limitations; and (F) failing to support his step five denial with "substantial evidence, given the ALJ thought he was limiting Mr. Foster to 'one and two-step tasks' and given Mr. Foster's inability to work in loud noise environments." (Doc. 13 at 1.)

### A. Whether the ALJ Properly Considered the VA Compensation and Pension Psychiatrist's Report

On September 8, 2017, VA Psychiatrist Janette H. Oleskowicz conducted a Compensation and Pension ("C&P") Examination of Claimant.[4] Dr. Oleskowicz

---

[4] The C&P examination is conducted by the VA for purposes of evaluating disability claims. *See, e.g.*, VA Claim Exam (C&P Exam), https://www.va.gov/disability/va-claim-exam/ (last visited Dec. 21, 2021) ("After you file your disability benefits claim, we may ask you to have a claim exam. . . . This exam will help us rate your disability."). The VA relies on the C&P exam, in part, to help the VA decide disability claims and decide how much compensation a veteran may receive. *See id.*

documented her findings in a document with the following title: Mental Health C&P Examination Consult: Local Title: PTSD, Review Standard Title: Mental Health C&P Examination Consult. (AR at 539.)

Dr. Oleskowicz stated that Claimant's diagnosis was, in relevant part, PTSD. (*Id.*) Although Claimant's affect was constricted to blunt and he showed easy frustration, his mental status examination also showed that Claimant was alert, oriented, cooperative, and had good eye contact, fair mood, and linear, coherent, and goal-directed thought flow without evidence of suicidal or homicidal tendencies/ideation. (*Id.* at 544.) Claimant had intact cognition and memory and was a reliable historian. (*Id.*)

Claimant told Dr. Oleskowicz that he last worked as a maintenance supervisor at Tyson, working 12-hours-per day, six-days-per week and "couldn't take it anymore." (*Id.* at 542.) In that position, Claimant had to "do time and attendance for 4 different shifts," but he had "issues with memory and concentration" and "multitasking can affect him." (*Id.*) In a section called "Medical Opinion Summary," Dr. Oleskowicz stated, "Regarding IU/functional limitations:"[5] . . . Claimant gets easily frustrated, reported "he couldn't handle the multiple stimuli and felt overwhelmed" in his job as a maintenance supervisor at Tyson Foods and had to leave his job. (*Id.* at 208, 547.) Dr. Oleskowicz also noted that Claimant had panic attacks twice a week on average. (*Id.* at 547.) Dr. Oleskowicz concluded that Claimant continued to meet DSM-5 diagnostic criteria for PTSD. (*Id.*)

### 1. *The Parties' Arguments*

Claimant argues that the ALJ failed to "articulate sufficient reasons for how persuasive [he] found Dr. Oleskowicz's opinions." (Doc. 13 at 5.) According to

---

[5] "IU" is an abbreviation for "individual unemployability." U.S. Department of Veterans Affairs, Veterans Benefits Association, *Individual Unemployability Factsheet*, 1 (2018), https://www.benefits.va.gov/BENEFITS/ factsheets/serviceconnected/IU.pdf.

Claimant, the ALJ's "non-addressing of Dr. Oleskowicz's opinion" was reversible error and "this Court should reverse the ALJ's decision and remand Mr. Foster's claim so the ALJ can properly evaluate Dr. Oleskowicz's opinions per the regulations." (*Id.* at 4, 5; Doc. 15 at 2 (citing *Pierce v. Colvin*, 2016 WL4014645 at *5-6 (N.D. Iowa July 26, 2016) (addressing ALJ's failure to address an examining opinion).)

The Commissioner responds that Claimant misunderstands the meaning of "medical opinion" in the context of this case. The Commissioner notes that "[f]or claims such as plaintiff's that were filed on or after March 27, 2017, the regulations define a medical opinion as 'a statement from a medical source about what [the claimant] can still do despite [his or her] impairment(s). . . .' 20 C.F.R. § 404.1513(a)(2)." (Doc. 14 at 6.) In addition, the Commissioner points out that "[a] physician's statement that a claimant can or cannot work is not a medical opinion." *Id.* (citing *Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017)).

The Commissioner argues that Dr. Oleskowicz's report is not a medical opinion because it does not explain what Claimant can do despite his impairments. (Doc. 14 at 6.) The Commissioner points out that Dr. Oleskowicz is a VA C&P psychiatrist who examined Claimant based on VA disability standards, which differ from Social Security Standards. (*Id.* (citing *Johnson v. Colvin*, No. 15 CV 113 EJM, 2016 WL 3360503, at *3 (N.D. Iowa June 14, 2016) ("The VA and SSA strongly differ on how they define disability. *See* Umar Moulta-Ali, Cong. Research Serv., *Disability Benefits Available Under the Social Security Disability Insurance (SSDI) and Veterans Disability Compensation (VDC) Programs* (2012). SSA compensates those who have a complete inability to work and '[t]he ability to work is not factored into [VA] determinations.' *Id.*").) The Commissioner further argues that the assertions in the VA medical records in August 2017 that Claimant said he could not return to his place of

employment are not medical opinions. (*Id.*) Dr. Oleskowicz cited this medical record in her report. (*Id.* at 546.)

The Commissioner also asserts that under the rules in place for claims filed after March 27, 2017, the ALJ properly weighed Dr. Oleskowicz's opinion. (Doc. 14 at 8-11.)

### 2. *Analysis*

> Other governmental agencies . . .— such as the Department of Veterans Affairs. . . — make disability, blindness, employability, . . . and other benefits decisions for their own programs using their own rules. Because a decision by any other governmental agency . . . about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules. Therefore, in claims filed . . . on or after March 27, 2017, *we will not provide any analysis in our determination or decision about a decision made by any other governmental agency . . . about whether you are disabled, blind, employable, or entitled to any benefits*. However, we will consider all of the supporting evidence underlying the other governmental agency['s]. . . decision that we receive as evidence in your claim. . . .

20 C.F.R. § 404.1504 (emphasis added). "For claims filed after March 27, 2017, the regulations state that evidence from other governmental agencies is 'inherently neither valuable nor persuasive.'" *Ramirez v. Saul*, No. 4:18-CV-1912-NAB, 2020 WL 2512225, at *6 (E.D. Mo. May 15, 2020) (citing 20 C.F.R. § 404.1520b(c)(1)). Few courts have addressed this issue since the new rules went into effect. However, the cases that have addressed the issue agree that when faced with C&P reports like the one in this case an ALJ need only consider the evidence underlying the VA's disability determination. *See Scott L. v. Saul*, No. 2:20-cv-00177-JDL, 2021 WL 1574451, at *3 (D. Me. Apr. 21, 2021), *R. & R. adopted*, 2021 WL 3234592 (D. Me. July 29, 2021) (noting that neither a C&P examination nor a VA PTSD evaluation were "medical opinions" requiring discussion or evaluation and that the ALJ noted that she considered,

among other things, evidence underlying the VA's award of disability benefits, and therefore, remand was unwarranted on this basis); *Diaz-Ortiz v. Comm'r of Soc. Sec.*, No. 2:20-CV-134-MRM, 2021 WL 4205850, at *12 (M.D. Fla. Sept. 16, 2021) ("[B]ecause the revised regulations apply to Plaintiff's case and the ALJ considered the supporting evidence underlying the VA's disability determination, the Court finds that the ALJ's failure to discuss the substance of Plaintiff's VA rating does not necessitate remand."); *Daniels v. Saul*, No. 7:19-CV-01003-RDP, 2020 WL 4922151, at *7 (N.D. Ala. Aug. 21, 2020) (ALJ's failure to directly address the VA's disability rating was not reversible error when ALJ considered the C&P exam and longitudinal VA treatment records); *see also Joshua G. v. Saul*, No. 19-CV-2467 MSK/ECW, 2021 WL 1102991, at *8 & n.8 (D. Minn. Feb. 2, 2021) (ALJ "neither ignored nor implicitly rejected the VA [100%] rating," and instead considered the rating, asked claimant about it, and discussed the underlying medical evidence contained in VA medical records, including the claimant's P&C examination) (distinguishing *Morrison v. Apfel*, 146 F.3d 625 (8th Cir. 1998)). *But see Johnathan W. v. Saul*, No. 6:19-CV-1242 (CFH), 2021 WL 1163632, at *4-7 (N.D.N.Y. Mar. 26, 2021) (finding it was reversable error to fail to consider C&P report of VA psychiatrist a "medical opinion" because it was well-supported with references to patient's medical records and addressed patient's ability to perform different types of work) (citing district precedent that had ruled the same way).

I find that the ALJ's failure to mention Dr. Oleskowicz's report was not reversable error. Under the new rules, the ALJ was not required to provide an analysis of any VA decision about whether Claimant is "disabled . . . employable, or entitled to benefits." 20 C.F.R. § 404.1504. Moreover, Dr. Oleskowicz's report is not an "opinion" under the rules because she did not explain what Claimant could do despite his impairments. 20 C.F.R. § 404.1513(a)(2); *Scott*, 2021 WL 1574451, at *3. Dr. Oleskowicz merely relayed that Claimant could not handle the multiple stimuli at his former job, felt

overwhelmed, had panic attacks twice a week on average, and had to leave "the job." (AR at 547.) There is no indication regarding what other kinds of work Claimant can do despite his impairments. In this way, the case at bar can be distinguished from *Johnathan W.*, 2021 WL 1163632, at *6-7.

As part of her C&P examination, Dr. Oleskowicz reviewed Claimant's VA records. Under the new rules, the ALJ was required to consider all of the supporting evidence underlying Dr. Oleskowicz's decision that he received as evidence. 20 C.F.R. § 404.1504. Dr. Oleskowicz cited to only three medical records in her report. (AR at 540-41 (citing April 10, 2015, April 11, 2016, and Aug. 24, 2017 psych notes), 546-47 (same).) The only medical record Dr. Oleskowicz cited that the ALJ did not cite is dated August 24, 2017 and noted Claimant's good friend since childhood had recently passed away, which was very stressful for Claimant. (*Id.* at 540.) Claimant's anxiety was high, his mood was low, and he reported low energy even though he exercised every day. (*Id.*) The treatment note stated that Claimant was unable to "return to his place of employment. We are just adjusting his medications." (*Id.*)

The ALJ cited extensively to VA records in his opinion (*Id.* at 16, 18), including both the April 10, 2015 and April 11, 2016 psych notes reviewed by Dr. Oleskowicz (*Id.* at 18 (citing AR at 541, 547)). *See Daniels*, 2020 WL 4922151, at *7 (ALJ considered longitudinal VA treatment records). The ALJ's failure to cite the August 24, 2017 psych note is not reversable error because the ALJ's extensive citation to the record shows that he reviewed the VA treatment notes underlying the C&P report. The only place the two treatment notes cited in both the ALJ decision and the C&P report appear is in the C&P report. The treatment notes are not duplicated elsewhere in the administrative record. The ALJ was "not required to discuss every piece of evidence" in the record. *See Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). Furthermore, "[a]n ALJ's failure to cite specific evidence

does not indicate that such evidence was not considered." *Id.* (bracket in original). That the ALJ cited evidence from the P&C review shows that he considered the evidence underlying the review.[6] Moreover, the information contained in this psych note is not information that would change any of the ALJ's other findings. First, at the time the treatment note was written, Claimant was experiencing stress from the death of a friend, which is a situational stressor. Situational stressors cannot provide the basis for a disability finding. *See Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010); *Dunahoo v. Apfel*, 241 F.3d 1033, 1040 (8th Cir. 2001). Second, the treatment note also states that Claimant could not return to his place of employment, a conclusion with which the ALJ agreed. (*Id.* at 19.)

In conclusion, the ALJ had no obligation to analyze the C&P examination as an opinion. Furthermore, the ALJ properly considered the evidence underlying the C&P examination and report, even though he did not cite all the evidence.

I recommend the District Court affirm this part of the ALJ's decision.

**B.** **Whether the ALJ Erred by Failing to Articulate how Persuasive he Found the Opinions of the State Agency Reviewing Psychiatrists**

The state agency reviewing psychiatrists noted that Claimant had been successfully employed until recently when "noise and environment became too strong of triggers for him." (AR at 68, 83, 93.) Initially, Myrna Tashner, Ed.D., found Claimant capable of a variety of instructions with varied concentration, persistence, and pace; working in "a low stress environment [with] less change and social interactions required"; and brief superficial interactions "when in his interest and motivation." (*Id.* at 68-69.) On May 25, 2018, Jennifer Ryan, Ph.D. reviewed Claimant's record on reconsideration and

---

[6] Because the above analysis disposes of the issue, I need not address the Commissioner's argument that VA treatment notes the ALJ cited note that Claimant had generally good functioning despite Claimant's complaints. (Doc. 14 at 9-11.)

affirmed Dr. Tashner's findings. (*Id.* at 83.) On June 6, 2018, Joan Joynson, Ph.D. also reviewed the file, affirmed the above findings, and clarified that Claimant, in pertinent part, could respond marginally but adequately to supervision, coworkers, and the general public, was better suited to low contact jobs, and could adequately adapt to workplace changes for simple, repetitive work functions. (*Id.* at 93.) The ALJ did not evaluate, or even mention, these opinions.

Claimant argues that this failure requires remand. (Doc. 13 at 6 (citing *Snyder v. Saul*, 2021 WL 537207, at *15 (N.D. Iowa Jan. 27, 2021) (remanding case for ALJ to properly evaluate state agency reviewing psychiatrists' opinions using the then-required five factors enumerated in Section 404.1527(c) even though it was clear that the ALJ "considered" the opinion), *R. & R. adopted by Snyder v. Comm'r of Soc. Sec.*, 2021 WL 521308 (N.D. Iowa Feb. 11, 2021).) The Commissioner responds that the ALJ's failure to mention the reviewing psychiatrists' opinions was harmless error because the RFC was consistent with the opinions. (Doc. 14 at 15.)

The Commissioner articulates the most important reason why remand is required based on this argument. If the ALJ found the state agency reviewing psychiatrists' opinions were the most persuasive opinions in the record, or at least were so persuasive that the final RFC was consistent with their opinions, the ALJ needed to explain why. *Hawkins v. Saul* recently addressed an almost identical issue. No. 4:20-CV-523 SRW, 2021 WL 3633699, at *8–9 (E.D. Mo. Aug. 17, 2021). In *Hawkins*, the claimant argued that the ALJ committed reversable error by failing to mention the opinion of Dr. Spence, a state agency non-examining medical consultant, in the decision and noted the RFC in the case was "very similar to the state agency RFC." 2021 WL 3633699, at *8. The Commissioner argued that the ALJ's oversight was harmless error that had no impact on the outcome of the case because the final RFC in the claimant's case was actually more restrictive than Dr. Spence's RFC. *Id.* *Hawkins* began its evaluation by stating the

medical opinion rule that all ALJs must follow: "When evaluating medical opinions and determining persuasiveness, the regulations *require* an ALJ to explain how he or she considered the factors of supportability and consistency in the decision. 20 C.F.R. § 404.1520c(b)(2)." *Id.* (emphasis added). *Hawkins* continued:

> Despite the Commissioner's assertion that the ALJ's oversight was harmless error, it appears from the ALJ's opinion and the hearing testimony that the ALJ relied heavily on the assessment of Dr. Spence by incorporating all of his limitations in the RFC determination, which significantly impacted the outcome of the disability determination. The ALJ only added one limitation, which reduced the amount of time Plaintiff could be exposed to extreme cold. Because the ALJ failed to explain how the opinion of a state agency consultant was more persuasive than Plaintiff's own treating physicians and consistent with the medical record, as required by 20 C.F.R. § 404.1520c, the Court finds the ALJ committed reversible error when she failed to articulate the basis for her reliance on, or specifically mention, Dr. Spence's RFC opinion. *See* 20 C.F.R. §§ 404.1520c(a); 416.920c(c)(3).

> After mostly discrediting the opinions of Plaintiff's treating physicians, the ALJ was then required to explain what other medical basis she relied upon in making Plaintiff's RFC determination. *See, e.g.*, *Myles v. Berryhill*, No. 17-C-4884, 2018 WL 3993731, at *3 (N.D. Ill. Aug. 21, 2018) (an ALJ must clearly articulate what medical evidence he relied on to support the limitations included in the RFC determination). Notably, the Court is only assuming the ALJ relied on Dr. Spence's opinion because it essentially mirrors Plaintiff's RFC. *See, e.g.*, *Phillips v. Saul*, No. 1:19-CV-34-BD, 2020 WL 3451519, at *3 (E.D. Ark. June 24, 2020) (remanding because "the ALJ did not articulate or explain the persuasiveness of the non-examining state agency medical consultants"). The Court, therefore, cannot discern whether the ALJ's assessment of Dr. Spence's medical opinion is supported by substantial evidence and, in turn, whether the RFC assessment is also supported by substantial evidence.

.   .   .

> The Court therefore finds it necessary to remand this case for further consideration of Dr. Spence's opinion to evaluate the persuasiveness of his RFC findings by considering the supportability of his RFC opinion with

relevant objective medical evidence as well as its consistency with the evidence from other medical sources and nonmedical sources in the claim.

*Id.* at *8–9.

The same outcome is required here. As will be discussed below, the ALJ found all other opinion evidence unpersuasive. (AR at 18.) The ALJ also found the third-party function report submitted by Claimant's VA Clinic Manager Theresa Stoker unpersuasive. (*Id.* at 18-19.) While the ALJ is not required to rely on opinion evidence to craft an RFC, *see Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016), and the ALJ relied on treatment notes in the record to support some of his findings (AR at 16, 18), the hypothetical the ALJ presented to the VE that became the RFC in this case appears to have been largely based on the state agency reviewing psychiatrists' opinions, just as was the hypothetical in *Hawkins*. (AR at 52 (limiting hypothetical claimant to "simple routine tasks with occasional interaction with coworkers and supervisors, but no work related interaction with the public, and [claimant] would be able to adapt to simple changes in a work setting").)

Even if the hypothetical was not based on these opinions, the ALJ was required to "articulate in [his] . . . decision how persuasive [he found] *all* of the medical opinions and all of the prior administrative medical findings in [the] case record." 20 C.F.R. § 404.1520c(b) (emphasis added). Moreover, an error is harmless only when a "claimant fails to provide some indication that the ALJ would have decided differently if the error had not occurred." *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) (internal quotations omitted). Here, as in *Hawkins*, even if failure to strictly follow the rules, alone, something the cases cited by the Commissioner do not support,[7] *Hawkins* points out that

---

[7] *St. Cyre v. Saul* is the case most on-point cited by the Commissioner. No. 4:18 CV 627 DDN, 2019 WL 2716193 (E.D. Mo. June 28, 2019). *St. Cyre*, however, can be distinguished from the case at bar because in that case, the ALJ did a thorough evaluation of the opinion at issue

"[a]fter . . . discrediting the opinions of Plaintiff's treating physicians, the ALJ was then required to explain what other medical basis [he] relied upon in making Plaintiff's RFC determination." 2021 WL 3633699, at *9 (citations omitted). Here, the ALJ discredited all the other opinion evidence in the record. (AR at 18.) I also note that I, like the ALJ in *Hawkins*, am only assuming that the ALJ relied on the state agency reviewing psychiatrists' opinions as the basis for his RFC because the opinions closely resemble the RFC. *See* 2021 WL 3633699, at *9. And, like the ALJ in *Hawkins*, I "cannot discern whether the ALJ's assessment of the [state agency reviewing psychiatrists' opinions are]

_____

and only failed to assign a weight to the opinion. *Id.* at *3. The ALJ also "discussed several details of [the opinion] at both Steps 3 and 4 of his analysis." *Id.* In addition, the ALJ found that certain of the opinion's conclusions were consistent with the RFC. *Id.* Therefore, assigning a specific weight to the opinion would not have impacted the ALJ's decision and failure to do so was harmless error. *Id.* However, in the instant case where the ALJ did not even mention the state agency reviewing psychiatrists' opinions, failure to assign a level of persuasiveness, the current requirement, is not harmless.

*Lockwood v. Colvin* can be distinguished because while the medical consultant's opinion at issue was not inconsistent with the ALJ's RFC finding, the medical consultant was not "an acceptable medical source," which meant that ALJ was not required to explain the weight he gave the opinion. 627 F. App'x 575, 577 (8th Cir. 2015). *Byes v. Astrue* merely states the general harmless error rule and is factually distinguishable from the case at bar. 687 F.3d 913, 917 (8th Cir. 2012) (addressing application of the age grids); *See also Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008) (applying harmless error rule in case where ALJ read hand-written notation as "work" rather than "walk"). Finally, the Commissioner cites the following case with the following parenthetical: "*Simmers v. Saul*, 478 F. Supp. 3d 747, 759 (S.D. Iowa 2020) (the ALJ erred by not addressing credibility but 'does it make a difference, i.e., is the error harmless?')." (Doc. 14 at 16.) *Simmers* answered that question, "No," and remanded the case because the ALJ failed to evaluate any evidence other than medical evidence. 478 F. Supp. 3d at 760.

supported by substantial evidence and, in turn, whether the RFC assessment is also supported by substantial evidence." *Id.*

I recommend the District Court remand for the ALJ to conduct a proper evaluation of the opinions under 20 C.F.R. § 404.1520c(b)(2) and explain how persuasive he finds the opinions. If the ALJ's persuasiveness evaluation changes the RFC, the ALJ should conduct a new hearing and present a new hypothetical to the VE.

## C. *Whether the ALJ Provided Sufficient Reasons for Finding Dr. Maassen's and Dr. Conditt's Opinion Unpersuasive*

Lani E. Maassen, Psy.D. and licensed psychologist Paul M. Conditt, Psy.D., conducted a mental status examination of Claimant on March 15, 2018. (AR at 336.) Their joint opinion will be referred to as "the opinion" and the report of Claimant's examination accompanying the opinion will be referred to as "the report."

Drs. Maassen and Conditt opined that Claimant's prognosis was poor. (*Id.* at 338.) They explained that

> [Claimant] has severe deficits in his memory that are likely attributable to PTSD and trauma he endured while in the military. His symptoms of PTSD significantly impact his ability to maintain fulltime employment as he experiences flashbacks, avoidance, and disassociation. He is very guarded, paranoid, and has difficulty trusting others, as he described the world as an "evil place." He rarely leaves his home unless required to do so. He would likely have difficulty interacting with others and fulltime employment would presumably exacerbate his symptoms of PTSD.

(*Id.*) Drs. Maassen and Conditt then stated that Claimant had severe impairments in his abilities to carry out instructions; maintain concentration and pace due to his memory deficits, difficulty paying attention, and easy distractibility. (*Id.*) They also opined that Claimant had severe impairments interacting with supervisors, co-workers, and the public; and with his memory. (*Id.*) To support this opinion, Drs. Maassen and Conditt stated that Claimant "has difficulty getting along with others. He does not trust people

and referred to the world as an 'evil place.' He exhibits avoidance and disassociates. He also has trouble remembering his coworkers' names." (*Id.* at 338-39.) They found Claimant had moderate impairment in his abilities to use good judgment and respond appropriately to changes in the workplace because of deficits in reasoning and judgment and because "panic attacks may be triggered by change in the workplace" or because "[c]ertain things in the workplace may also trigger flashbacks." (*Id.* at 339.)

The ALJ evaluated the opinion in the following way:[8]

> In the current case, while Dr. Conditt may have examined the claimant, his conclusions lack support from the weight of the other evidence, and hence, they lack consistency with the record as a whole. While the claimant may have demonstrated significant difficulty during Wechsler Memory Scale testing, for example, Dr. Conditt explicitly noted his lack of motivation during that testing. Additionally, other medical sources never suspected memory difficulties. In fact, quite to the contrary, and as previous referenced, mental status exams by treating sources consistently yielded results of intact recent and remote memory, as well as intact concentration, full orientation, goal-oriented thought processes, and regular and coherent speech. Moreover, the only time the undersigned found reference to the claimant indicating memory problems occurred before the alleged onset date, and he dismissed them as "just the normal stuff of getting old" (Exhibit 11F, pages 16 & 22). When considered with the claimant's activities of daily living, which includes duties as primary custodial parent of two young children, the undersigned finds insufficient support from the evidence for Dr. Conditt's opinions. Therefore, the undersigned deems them unpersuasive.

(*Id.* at 18.)

### 1. *Relevant Law*

Claimant's claim was filed after March 27, 2017. Therefore, the rules articulated in 20 C.F.R. Sections 404.1520c apply to analysis of this opinion. Under these rules,

---

[8] The ALJ refers to the opinions as "Dr. Conditt's opinions," even though the opinions are both Dr. Maassen's and Dr. Conditt's opinions.

no medical opinion is automatically given controlling weight. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Opinions from medical sources are evaluated using the following factors: (1) supportability, (2) consistency, (3) provider's relationship with the claimant, (4) specialization, and (5) other factors. *Id.* §§ 404.1520c(c), 416.920c(c). Supportability and consistency are the most important factors when determining "how persuasive the ALJ find[s] a medical source's medical opinions . . . to be." *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ "may, but [is] not required to, explain how [he or she] considered the factors in paragraphs (c)(3) through (c)(5). . . ." *Id.*

## 2. *The Parties' Arguments*

Claimant argues that the "ALJ erred by playing doctor and rejecting Dr. Conditt's opinions based on the ALJ's own interpretation of the mental status examination findings." (Doc. 13 at 9 (citing *Combs v. Berryhill*, 878 F.3d 642, 647-48 (8th Cir. 2017).) Specifically, Claimant takes issue with the ALJ's characterization of the evidence regarding memory testing. (*Id.*)

Claimant also avers that his reports to SSA and healthcare providers are consistent with the opinion. (*Id.* at 9-10 (citations omitted).) Claimant further argues that the ALJ faulted him for being the primary custodial parent for his two young children and that with the increased anxiety and stress he experiences outside of his home, taking care of his children was not a good reason to reject the opinion. (*Id.* at 10-11.)

The Commissioner responds that "the weight of [Claimant's] treatment notes consistently show[ed] intact memory and concentration, goal-oriented thought processes, and regular speech, subjects the ALJ discussed with abundant record citations." (Doc. 14 at 19 (citing AR at 16, 18, 407, 434, 499, 509, 533, 537, 544, 571).) The Commissioner also points out that the ALJ found that the only time memory problems were mentioned in a treatment note was in 2015, prior to Claimant's alleged onset of disability date, when Claimant told a VA healthcare provider that he "ha[d] no real

concerns about his memory, saying 'just the normal stuff of getting old.'" (*Id.* (citing AR at 18, 541, 547).)

The Commissioner also states that the ALJ properly weighed Dr. Maassen and Dr. Conditt's observation that Claimant lacked motivation during testing and "often gave up quickly" when items became difficult," which, according to the Commissioner, detracted from their conclusion that Claimant had memory restrictions. (*Id.* at 20 (citing *Jones v. Astrue*, 619 F.3d 963, 973 (8th Cir. 2010) (noting that in that case, "doctor commented that the claimant probably exaggerated").)

Finally, the Commissioner argues that the ALJ properly weighed Claimant's activities, including his duties as the primary care giver for his two young children. (*Id.* at 12-15, 19-20.)

### 3.    *Analysis*

Supportability and consistency are the most important factors when determining "how persuasive the ALJ find[s] a medical source's medical opinions . . . to be." 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ "may, but [is] not required to, explain how [he or she] considered the factors in paragraphs (c)(3) through (c)(5). . . ." *Id.*

#### a.    *Supportability*

"The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . ., the more persuasive the medical opinions . . . will be." 20 C.F.R. §§ 404.1520c(c)(1); 416.920c(c)(1). Drs. Maassen and Conditt are consulting psychiatrists who only examined Claimant once. Their opinion is based on "test results and other available information and it is based upon inferences, psychometric probabilities, and the typical limited time affordable to gather data and information." (AR at 336.) The opinion

cautions that "[o]ther information should be used in making decisions regarding this claimant." (*Id.*)

In pertinent part, Drs. Maassen and Conditt noted the following relevant history. Claimant was 58-years-old at the time of his examination and lived in a house with his seven- and eight-year-old children. (*Id.* at 336.) Claimant is divorced and has custody of his children. (*Id.*) Claimant joined the army at 17 and "served all over" during his military career, which lasted almost 16 years. (*Id.* at 336-37.) Claimant's last job was as a maintenance supervisor at Tyson, a position he held for five years. (*Id.* at 337.) Claimant stated that he started having trouble remembering his employees' names at Tyson. (*Id.*)

Drs. Maassen and Conditt noted that Claimant experienced symptoms of PTSD including flashbacks, avoidance, and disassociation, all symptoms Claimant reported to them. (*Id.* at 337-38.) However, there is no indication in the opinion how often Claimant experiences these symptoms or what triggers them. Claimant also reported that he is easily distracted, has "poor attention," and that he does not finish tasks. (*Id.* at 337.) Claimant "reported that he 'does not trust anyone around his children because the world is an evil place.'" (*Id.*) Claimant also said that he does not like to socialize with anyone and that his neighbors do not like him. (*Id.*) Under "Activities of Daily Living," the opinion stated the following:

> On a typical day, [Claimant] wakes up around 6:30 in the morning. He puts his children's clothes out the night before and gets their breakfast and lunch ready in the morning. After he gets ready, he takes them to school, walks them into school, and picks them up at the end of the day. He completes the chores around the house and reported that he has to have everything lined up. He makes pizza, hamburgers, and chicken. He only goes shopping with his children. He reported that they do not go out at night. He checks to ensure the doors are locked three times and gets up in the middle of the night to check the doors. Thomas has limited interests, other than spending time with his children and working in his yard.

(*Id.* at 337-38.) Claimant's only interests are spending time with his children and working in his yard. (*Id.* at 338.) Claimant told Drs. Maassen and Conditt that he spends 95% of his time in the house. (*Id.* at 337.)

Drs. Maassen and Conditt administered the Wechsler Memory Scale ("WMS") to Claimant. Claimant's scores on the WMS show low percentile rankings in all categories: .3-13 percent. (*Id.* at 338.) However, Drs. Maassen and Conditt noted that Claimant "appeared to lack motivation during administration of the WMS and often gave up quickly when items became more difficult." (*Id.*)

Based on the limited results of their examination and Claimant's remarks to them, I find that the opinion is partially supported. While Claimant told Drs. Maassen and Conditt that he had trouble remembering his employees' names and that he was easily distracted and Claimant's WMS results indicate memory issues, Drs. Maassen and Conditt did not seem to account for Claimant's lack of motivation during the test in their final assessment. In his decision, the ALJ acknowledged the WMS results, but relied mostly on evidence other than that found in Dr. Maassen's and Conditt's report and opinion for finding the opinion unpersuasive. (*Id.* at 18.)

Drs. Maassen and Conditt stated that Claimant would have difficulty trusting others because he views the world as an evil place. (*Id.* at 338.) However, Claimant said he does not trust people around his children because he views the world as an evil place. There is no indication that he views coworkers as evil. There is also no indication in this examination report regarding what triggers Claimant's PTSD or his panic attacks, although he said he does not like crowds or fireworks. Therefore, while Claimant endorsed a history of panic attacks and a diagnosis of PTSD (*Id.* at 336-37), the conclusions that workplace changes or "certain things in the workplace" could trigger panic attacks or PTSD (*Id.* at 339) are unsupported. Likewise, the conclusion that "fulltime employment would presumably exacerbate his symptoms of PTSD" (*Id.* at 338)

23

is also unsupported. The only mention of "work" in the report is when Claimant said he had trouble remembering his employees' names. (*Id.* at 337.) Claimant did not, however, say that this memory issue is why he no longer works at Tyson. (*Id.*)

Thus, some evidence in this report supports the ALJ's conclusion that the opinion is unpersuasive and some evidence in this report supports the conclusion that the opinion is at least somewhat persuasive regarding Claimant's memory issues. I conclude that this factor weighs slightly in favor of finding the opinion at least somewhat more persuasive than "unpersuasive."

### b. Consistency

"The more consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] . . . will be." 20 C.F.R. § 404.1520c(c)(2); 20 C.F.R. § 416.920c(c)(2).

Claimant's main argument is that the ALJ mischaracterized the evidence in the record related to memory testing. (Doc. 13 at 9.) Claimant argues that his memory limitations are "perhaps better characterized as sustained concentration and persistence limitations." (*Id.* (citing AR at 66-67, 68-69, 81, 82-83 ("agency psychological consultants explaining Mr. Foster does not handle stress well and that Dr. Conditt's examining opinions were persuasive")).) Claimant argues that "his observed memory problems . . . in part [are] related to persistence difficulties" and notes that Drs. Maassen and Conditt "attributed [his] memory problems on exam to his PTSD and trauma." (*Id.* (citing AR 338 ("Thomas appeared to lack motivation during the administration of the WMS and often gave up quickly when items became more difficult."))).) Claimant explains that while his memory and persistence issues would not necessarily be discovered on a "general superficial mental status examination," his difficulties were "flushed [sic] out" on the more comprehensive WMS testing administered by Drs. Maassen and Conditt. (*Id.*)

"Concentrate, persist, or maintain pace . . . refers to the abilities to focus attention on work activities and stay on task at a sustained rate." 20 C.F.R. pt. 404, subpt. P, pt. 2, app. 1, § 12.00(E)(3). Although Claimant argues that his lack of motivation and willingness to give up when items became difficult were persistence difficulties, a lack of motivation and lack of desire to try difficult tasks is not necessarily a persistence issue under the rules. The rules provide the following examples of the abilities to focus attention on work activities and stay on task at a sustained rate:

> Examples include: Initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day.

*Id.* The opinion does not state that Claimant had difficulty maintaining an appropriate pace. Rather, Drs. Maassen and Conditt found that the problem was one of motivation and willingness to try when things became more difficult. Dr. Myrna Tashner, the first of the three state agency reviewing psychiatrists to review Claimant's record, stated that Claimant "gave up easily on the WMS, thus the scores wouldn't adequately reflect his true potential, [though] did reflect his function when distracted."[9] (AR at 68.)

Claimant also takes issue with the ALJ's reliance on years of treatment notes in the record finding Claimant did not have memory issues. (*Id.* at 18.) The ALJ cited over a dozen treatment notes stating that Claimant had normal mental status examinations, including, among other things, intact recent and remote memory an intact attention span

---

[9] Drs. Maassen and Conditt did not mention that Claimant appeared distracted during administration of the WMS or at any other time during his assessment. Thus, the basis for this part of Dr. Tashner's assessment is unclear.

and concentration. (*Id.* at 16 (citing AR 354, 397-98, 407, 449, 490, 495, 499, 509, 533, 537, 544, 553, 564, 571, 575).) Claimant wants the ALJ to ignore all this evidence, calling the mental status examinations cited by the ALJ "general superficial mental status examination[s]," in favor of the WMS results, which Claimant asserts "flushed [sic] out" his memory and persistence difficulties in ways that the other mental status examinations could not. Claimant misconstrues the evidence. While some of the treatment notes cited by the ALJ are associated with shorter mental status evaluations, several of the evaluations are more in-depth. (*E.g.*, AR at 490, 499, 533.) Furthermore, Claimant sets up a false comparison. The WMS tests only memory and the mental health examinations administered by the mental health professionals at the VA are more broad-based. Moreover, none of the narratives in the treatment notes cited by the ALJ state that Claimant mentioned memory problems or that the VA healthcare providers noticed that Claimant had memory issues. *See Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016) (a lack of complaints to a healthcare provider detracts from allegations of disabling impairments). Therefore, the ALJ was justified in discounting the opinion because "the limitations are not reflected in the treatment notes or medical records." *Toland v. Colvin*, 761 F.3d 931, 935-36 (8th Cir. 2014).

To the extent Claimant asserts that his memory problems are actually concentration problems, the evidence cited by the ALJ also states that Claimant's "[a]bility to sustain focus and attention [were] intact" and that his attention span and concentration were intact. (*Id.* at 354, 397-98, 407, 449, 490, 495, 499, 509, 533, 537, 544, 553, 564, 571, 575.) Claimant cites no treatment notes documenting memory or concentration issues. In the parties' Statement of Material Facts ("SMF"), the parties cite only three treatment notes where Claimant mentions concentration problems and none where Claimant complains of memory issues. (Doc. 12.) The SMF states that on July 10, 2017, Claimant reported that he was feeling increased anxiety due to increased job stress, "with his focus

and concentration compromised." (*Id.* at 4 (citing AR at 568).) ARNP JoEllen C. Kubik noted that Claimant "may need to have a leave from his work duties." That leave occurred on July 13, 2017. (*Id.*; AR at 40 (Claimant's Hr'g Test.).) Although Claimant reported problems with concentration and focus on September 21, 2017, shortly after he stopped working, Ms. Kubik found his ability to concentrate intact. (Doc. 12 at 5 (citing AR 534-35).) The parties also noted that Claimant reported "concerns with his concentration [and] focus" on July 12, 2018. (*Id.* at 7 (citing AR at 405).) Ms. Kubik found that Claimant's concentration was intact during his mental health examination. (*Id.* (citing AR at 407).) During this examination, Claimant stated that he did not want to change his medications because he thought they were working well. (AR at 405.) Claimant was only getting five hours of sleep a night and was having nightmares about 10 times a week. (*Id.* at 404-05.) However, he worked out and exercised four days a week, was "very active with his children," and had taken them to a pool the previous day. (*Id.*) All other treatment notes cited by the parties state that Claimant had intact memory and concentration. (Doc. 12 at 7-9.)[10] Three notations of concentration issues among years of normal mental status examinations is not cause for remand. "The fact that there was some medical evidence supporting [Claimant's] position concerning the severity of [his] symptoms does not mean that the ALJ's decision was not supported by substantial evidence." *Adamczyk v. Saul*, 817 F. App'x 287, 290 (8th Cir. 2020) (citing *Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017)) ("While it is not surprising that, in an administrative record which exceeds 1,500 pages, [appellant] can point to some evidence which detracts from the Commissioner's determination, good

---

[10] The SMF also discusses opinion evidence and Claimant's testimony, which I discuss separately.

reasons and substantial evidence on the record as a whole support the Commissioner's RFC determination.") (bracket in original).

The Commissioner also notes that none of Claimant's healthcare providers observed the dissociative states to which Drs. Maassen and Conditt referred and several "affirmatively stated [Claimant's] mood was euthymic."[11][12]  (Doc. 14 at 19 (citing AR at 499, 509, 544, 552-53, 571).)  The Commissioner is correct.  There is no support in the record for these opinions.

The ALJ acknowledged that although Claimant receives medication management for his mental health symptoms, he does not attend counseling.  (AR at 16 (citing AR 337).)  The ALJ also correctly noted that while Claimant had "a few sessions with a psychologist in January and March 2019, . . . it does not appear he returned for services after receiving functional capacity questionnaire responses from that source."  (*Id.* (citing AR 439-51, 497-500, 511).)  Claimant actually attended three sessions with psychologist Dr. Laura McDonald, one in January and two in March, 2019.  At his March 14, 2019 appointment, the plan was to continue with bi-weekly sessions through April 2019.  (AR at 490.)  Claimant saw Dr. McDonald for the last time on March 27, 2019.  (*Id.* at 497-500.)  At this appointment, Claimant canceled the rest of the previously-scheduled appointments.  (*Id.* at 499.)  In early May 2019, Claimant's counsel requested Ms. McDonald complete an opinion form and followed up with a phone call in June 2019. (*Id.* at 511.)  Importantly, as the ALJ stated, Dr. McDonald noted mostly normal mental status examination results.  (*Id.* at 16.)  Specifically, Dr. McDonald noted normal

---

[11] A euthymic mood is "a normal, tranquil mental state or mood." *Merriam-Webster*, euthymia, https://www.merriam-webster.com/medical/euthymia (last visited Jan. 4, 2022).

[12] The Commissioner also argued that none of Claimant's healthcare providers "observed . . . active psychosis to which Drs. Maassen/Conditt attributed other work impairments."  (Doc. 14 at 19.)  This argument is misplaced.  Drs. Maassen and Conditt found that "[n]o evidence of psychosis was present."  (AR at 338.)

28

memory and intact concentration, the two categories that Claimant focuses on in his arguments.

The ALJ also found Claimant "demonstrated his generally intact mental status by virtue of his ongoing daily activities during the period under review." (*Id.*) The ALJ quoted most of the "Activities of Daily Living" section of Dr. Maassen and Conditt's opinion and noted that in his function report, Claimant "confirmed that he lives in a house with his children, drives, attends church, mows his yard, and performs household repairs. (*Id.* (citing AR at 235).) The ALJ concluded that these activities, "while not indicative of an absence of functional limitations, . . . denote[d] the ability to perform unskilled, socially limited work that involves only simple, work-related decisions." (*Id.*)

Claimant argues that contrary to what the ALJ found, his submissions to SSA support the opinion. Claimant stated in his function report that anxiety affects him, that he has trouble prioritizing tasks, and that he worries about people getting hurt. (*Id.* at 237.) Claimant also stated that his ability to handle stress was "not good." (*Id.* at 238.) He argues that he told SSA that work increases his stress level. (*Id.* 247, 265.) Claimant asserts that "stress and anxiety took [him] out of work." (Doc. 13 at 9 (quoting AR 332 (treatment note of primary care provider).) Claimant also avers, "Stress, as measured by the PCL-5, was obviously a problem . . . . TR 446 (PCL-5 Score of 41, showing severe symptoms)." (*Id.* at 9-10.) Claimant also argues that his main treatment goal was stress reduction. (*Id.* at 9 (citing AR at 354, 434).) Claimant testified that cigarette smoke, burning, diesel fumes, loud noises, loud music, barking dogs, and people walking up behind him that he does not see are triggers for his PTSD and panic attacks. (AR at 43-44.) Claimant also testified that changes in routine can cause panic attacks. (*Id.* at 48.)

Claimant misreads some of his treatment notes. Stress reduction was not his main treatment goal. His long term goals are "optimal psychosocial functioning and

satisfaction." (AR at 354, 434.) His short term goal is "euthymic mood, medication adherence, appropriate diet, and exercise level." (*Id.*) One of the services Ms. Kubik provided was medication management with discussion of healthy living skills and stress reduction. (*Id.*) In addition, the same treatment notes that contain the results of Claimant's PCL-5 score note that Claimant quit working in July 2017 because his job at Tyson "became too stressful. . . . he was being asked to work extended hours and he was not able to tolerate the smells of the meat processing plant." (*Id.* at 448.)[13] As discussed above, Claimant's C&P report documents that Claimant left Tyson because he could not handle the "multiple stimuli" in the job and he was feeling overwhelmed. (*Id.* at 547.) Claimant did not mention feeling stressed when he met with Drs. Maassen and Conditt. (*Id.* at 337.) In addition, the Commissioner points out that Ms. Kubik, the healthcare provider who saw claimant most often, encouraged him to volunteer, which indicates that Claimant is able to engage with people outside of his home. (Doc. 14 at 9 (citing AR at 395, which is part of a treatment note cited by the ALJ ("*Again* patient was encouraged to volunteer and do activities.") (emphasis added)).) As discussed above, the state agency reviewing psychiatrists acknowledged Claimant's stress and still found he was able to work. (*Id.* at 68-69, 83, 93.) RFC is what a claimant can still do despite his limitations. *Guilliams*, 393 F.3d at 801.

In this case, Claimant's RFC does not require him to perform jobs that involve multiple stimuli. Rather, his RFC only requires him to perform jobs that involve simple, routine tasks with no more than simple changes in the work setting. (*Id.* at 14.) In

---

[13] The treatment note also states that when Claimant was a gunnery sergeant in the Gulf War in 1990-91, he saw stacks of dead and dismembered bodies. (AR at 448.) Claimant also testified that when he was in Iraq, he had to pick up dead, dismembered, and burned bodies and bury them. (*Id.* at 43.)

30

addition, the RFC limits Claimant to no more than occasional interaction with coworkers and supervisors and no interaction with the public. (*Id.*)

Claimant also takes issue with the ALJ's mention of his ability to care for his children. Claimant asserts that some Eighth Circuit decisions appear to indicate that claimants must give up their children to foster care to receive Social Security disability benefits when that is not actually required. (*Id.* at 10 (comparing *Johnston v. Apfel*, 210 F.3d 870, 875 (8th Cir. 2000), which allegedly requires claimants to surrender children, with *Eback v. Chater*, 94 F.3d 410, 413 (8th Cir. 1996) and *Hill v. Berryhill*, No. 18-cv-15-MAR, 2019 WL 699897 at *9 (N.D. Iowa Feb. 20, 2019), which held that "[t]he Eighth Circuit has repeatedly held that a claimant's ability to perform household chores in a safe and structured home environment does not necessarily mean she can perform gainful work activity outside the home.").) Claimant contends that his ability to take care of his children does not indicate an ability to work "and did not amount to a good reason for rejecting Dr. Conditt's opinions." (Doc. 13 at 11 (citations omitted).)

The Commissioner responds that although Claimant "hyperbolically asserts that he would be required to put his children in foster care before qualifying for benefits, . . . . the ALJ could consider [Claimant's] ongoing caretaking along with other evidence." (Doc. 14 at 12) (citations omitted).) The Commissioner also correctly notes that *Johnston* "merely recited the medical evidence and activities supporting the ALJ's decision, one of which was taking care of a young child." (*Id.* (citing *Johnston*, 210 F.3d at 875).) I agree with the Commissioner that "[n]either court decisions nor SSA regulations require [Claimant] or the Court to choose between family and benefits." (*Id.*)

In addition, Claimant's argument that his ability to take care of his children was not a "good reason for rejecting Dr. Conditt's opinions," is without merit. While the ALJ recited Claimant's daily schedule, which revolves around caring for his children and caring for his home and property, and concluded that the activities "denote[d] the ability

31

to perform unskilled, socially limited work that involves only simple, work-related decisions," the ALJ also relied on Claimant's mental status examinations and lack of regular counseling when crafting the RFC. (AR at 16-17.)

Claimant also argues that caring for his children was not always easy for him. (Doc. 13 at 10 (citing AR at 401 (treatment note stating that Claimant gets overwhelmed and teary during the day and his children have noticed and ask him what is wrong).) Claimant also states that his focus during the relevant time period was raising his children, even though it was challenging. (*Id.* (citing AR at 431 (ex-wife is unpredictable and raising young children at 58 is "quite a challenge"), 446 (Claimant deals with "parenting stress" and his ex-wife usually misses her scheduled visitations), 489 (Claimant stated that single parenting is stressful, "but takes great pride in raising his kids"), 506).) Claimant also notes that as he approached his onset of disability date and was working and caring for his children at the same time, "he broke down." (*Id.* at 573.)

The treatment notes Claimant cites do not undermine the ALJ's decision regarding the opinion. AR 401 states that Claimant was experiencing increased anxiety and an inability to sleep since he had run out of clonazepam a week earlier. Claimant was given a new prescription for clonazepam and quetiapine was added to his medication regimen. (AR at 404.) At his next appointment on July 12, 2018, Claimant said the clonazepam and quetiapine were helping him get to sleep and that his anxiety was "tolerable" at 4/10. (*Id.*) The group of treatment notes Claimant cites regarding the stress of raising children does not undermine the ALJ's decision. In fact, Claimant said the highlight was getting to spend time with his children. (*Id.* at 431.) The June 18, 2019 treatment note at AR 506 sums up Claimant's parenting style and concerns:

> [H]is kids are home from school for the summer. Spending time biking and swimming. He states he tries to cook well for them. Sounds like they really appreciate their daddy from the scenarios he provides. . . . [O]bvious that his children are his priority. He shares scenarios regarding their

biological mother who does come to see them. He reports that she appears to have addiction to drugs. He is concerned and watchful other [sic] children's safety when they are with her. We discussed the importance of children calling if they ever feel unsafe.

A worrisome relationship with an ex-spouse is not a limitation that prevents a person from working. Claimant does not state that he has difficulty handling his parenting responsibilities. Lastly, AR 573 does not indicate that Claimant cannot work and parent at the same time or that Claimant "broke down" before he left Tyson. That July 10, 2017 treatment note states that Claimant had been promoted two months earlier and the new job was "excessively stressful," that Claimant did not get much time off, and that he was hoping to change jobs to another department as soon as possible to reduce stress. (AR 573.) These treatment notes do not undermine the ALJ's decision.

Finally, Claimant asserts that the ALJ "played doctor" by "rejecting Dr. Conditt's opinions based on the ALJ's own interpretation of the mental status examination findings." (Doc. 13 at 9.) For support, Claimant cites *Combs v. Berryhill*, in which the Eighth Circuit found the ALJ impermissibly relied "on his own inferences as to the relevance of" a treating physician's notations in treatment notes when determining the weight to assign conflicting reviewing physicians' opinions. 878 F.3d 642, 646-47 (8th Cir. 2017). *Combs* reasoned that in light of the claimant's medical history, the relevance of the two notations was unclear and remand was necessary for the ALJ to investigate the claimant's ability to function in the workplace. *Id.* at 647. *Combs* can be distinguished from the instant case because the ALJ in this case did not interpret unclear treatment notes. Instead, he fulfilled his duty to weigh the evidence in the record. As discussed above, that evidence shows that Claimant had generally normal mental status examinations, including normal memory and concentration examinations.

I conclude that this factor weighs in favor of finding the opinion unpersuasive.

33

### c. Conclusion

Although the supportability factor weighed slightly in favor of finding the opinion more persuasive, substantial evidence on the record as a whole supports the ALJ's decision. *See Moore*, 572 F.3d at 522 (the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision). I recommend the District Court affirm this part of the ALJ's decision.

### D. Whether the ALJ Provided Sufficient Reasons for Finding Dr. Laura McDonald's Opinion Unpersuasive

Dr. McDonald completed a mental impairment check-box, fill-in-the-blank questionnaire on July 8, 2019. (AR at 518-23.) Dr. McDonald noted that she did an initial consultation with Claimant on January 16, 2019 and then had two follow-up appointments with Claimant in March 2019. (*Id.*) Dr. McDonald said she saw Claimant "briefly in Jan.-March 2019." (*Id.*) As the ALJ noted, Dr. McDonald "checked 'Marked' regarding the limitations the claimant experiences in his ability to interact with others, concentrate, persist, or maintain pace, and adapt or manage himself. Other opinions included a prediction of off-task behavior 20 percent of the workday." (*Id.* at 18.) Dr. McDonald also opined that Claimant's impairment would not cause him to miss any work, although she put a question mark beside her check-mark in the "never" box. (*Id.* at 522.) On a checklist of 16 Mental Abilities and Aptitudes Needed to Do Unskilled Work, Dr. McDonald opined that Claimant had unlimited, very good, or limited but satisfactory ability to perform 11 of the skills. (*Id.*) She found that Claimant had seriously-limited abilities to (1) work in coordination with or proximity to others without being unduly disturbed, (2) complete a normal workday and workweek without interruptions from psychologically-based symptoms, (3) accept instructions and respond appropriately to criticism from supervisors, (4) get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, and (5) deal with normal work

stress. (*Id.*) Dr. McDonald supported her conclusions by stating that Claimant's "PTSD symptoms make it difficult and interfere with ability to interact appropriately with coworkers. These symptoms include low frustration tolerance, anger control issues." (*Id.*) Dr. McDonald opined Claimant was only seriously limited in two abilities needed to perform semi-skilled work and certain jobs: (1) his ability to deal with the stress of semi-skilled and skilled work because his PTSD symptoms interferes with his ability to manage stress and he has low frustration tolerance, and (2) his ability to perform jobs where he would have to interact with the general public because his PTSD, anxiety, and hypervigilance around people would cause him distress. (*Id.* at 521.)

The ALJ found Dr. McDonald's opinion unpersuasive:

> [J]ust like Dr. Conditt, Dr. MacDonald's [sic] conclusions fall well outside the reasonable deductions one can make from the claimant's mental status exam results, daily activities, and lack of regular counseling. Moreover, Dr. MacDonald encountered the claimant on few occasions between mid-January and late-March 2019, during which times even she documented normal mental status observations—including euthymic mood, socially appropriate eye contact, and engaged and responsive attitude (Exhibit 9F, pages 55 & 64). Therefore, the undersigned finds insufficient support and consistency for Dr. MacDonald's opinions and deems them unpersuasive.

(*Id.* at 18.) Dr. McDonald's opinion will be evaluated using the same factors set forth in part III.C, *supra*.

### 1. Supportability

"The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . ., the more persuasive the medical opinions . . . will be." 20 C.F.R. §§ 404.1520c(c)(1); 416.920c(c)(1).

### a.      The Parties' Arguments

Claimant argues that

> The ALJ's RFC clearly does not account for Dr. McDonald's limitation opinions that Mr. Foster would be seriously limited in dealing with normal work stress, completing a normal workday and workweek without interruptions from psychologically based symptoms, and accepting instructions and responding appropriately to criticism from supervisors, or Dr. McDonald's opinion that Mr. Foster would be off task at work twenty percent of a workday.

(Doc. 13 at 13 (citations omitted).)  Claimant further asserts that the ALJ's failure to "note and consider" Dr. McDonald's PCL-5 scoring undermines his assessment of Dr. McDonald's opinion.  (*Id.* at 14.)

The Commissioner responds that the ALJ conducted a proper evaluation under the rules.  (Doc. 14 at 21.)  In addition, the Commissioner argues that even though Dr. McDonald's opinion was "cursory" and the ALJ found it unpersuasive, many of the boxes Dr. McDonald checked were consistent with the RFC.[14]  (*Id.* at 22.)

---

[14] Claimant takes issue with the Commissioner's use of the word "cursory" and argues that the Commissioner should not "attempt to shoehorn a 'vague/conclusory checklist opinions' framework into this case" because Dr. McDonald provided explanations for her opinions.  (Doc. 15 at 3.)  Dr. McDonald provided explanations for some of her opinions, but did not reference tests or other medical evidence to support her opinions.  In addition, there is no denying that she checked boxes to answer questions because the form provided was a check-box form. Importantly, the Commissioner does not make the argument that the opinion should be discounted because it is a cursory check-box opinion. *Contra Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018) ("[Dr. Hollis's] assessments . . . . consist of nothing more than vague, conclusory statements—checked boxes, circled answers, and brief fill-in-the-blank responses. They cite no medical evidence and provide little to no elaboration, and so they possess little evidentiary value. On that basis alone, the ALJ did not err in giving Dr. Hollis's RFC assessments little weight and relying more heavily on other opinions in the record.") (internal quotations and citations omitted).

### b.    Analysis

As discussed above, the ALJ stated that Dr. McDonald noted mostly normal mental status examination results. (*Id.* at 16 ("with the exception of irritability noted in his mood and affect on some occasions, mental status examinations by that psychologist . . . consistently demonstrated normal results").) Specifically, Dr. McDonald noted normal memory and intact concentration, the two categories that Claimant focuses on in his arguments.

Although Dr. McDonald stated that Claimant would be seriously limited in dealing with normal work stress (*Id.* at 521), would be off task twenty percent of the workday (*Id.*), and would be seriously limited in his ability to complete a workday and week without interruptions from symptoms (*Id.* at 520), her treatment notes belie these findings. On his Mental Health Diagnostic Study during his first appointment with Dr. McDonald, Claimant answered that he got along with people outside of his family about half the time, always got along well in social situations, and never has angry outbursts or acts aggressively. (*Id.* at 446-47.) Dr. McDonald also noted that Claimant left Tyson because "he was unable to tolerate the increasing stress levels." (*Id.* at 446.) Claimant was being asked to work extended hours and he could not tolerate the smells of the meat packing plant. (*Id.* at 448.) Claimant would only be working 40 hours a week in any job cited by the VE. *See* SSR 96-8P (explaining that RFC is ordinarily "an assessment of an individual's ability to do sustained work-related . . . activities in a work setting on a regular and continuing basis. . . . 8 hours a day, for 5 days a week, or an equivalent work schedule"). Claimant does not take issue with smells related to any of the jobs cited by the VE. (Docs. 13, 15.) Furthermore, although Claimant stated he had trouble concentrating on reading or watching television more than half the time, Dr. McDonald consistently found Claimant's attention span and concentration intact. (*Id.* at 447, 448, 490, 499.)

In addition, as the Commissioner argued, the ALJ found Claimant was only able to perform unskilled work (AR at 15-20), which is in concert with Dr. McDonald's opinion that Claimant is seriously limited in his ability to perform jobs requiring semi-skilled or skilled work (*Id.* at 521). Furthermore, Dr. McDonald opined that Claimant was seriously limited in interacting appropriately with the general public, which equates with the RFC's limitation to no public interaction. (*Id.* at 14, 521; Doc. 14 at 22.) Finally, the Commissioner correctly notes that Dr. McDonald found Claimant had unlimited or very good abilities "to remember procedures, work with very short and simple instructions, regularly attend, sustain an ordinary routine, make simple decisions, and respond appropriately to changes in routine work settings." (Doc. 14 at 22 (citing AR at 520).)

The only treatment note indicating support for Dr. McDonald's opinions lends some support to the opinion that Claimant would have problems accepting instructions and responding appropriately to criticism from supervisors. On March 19, 2019, Dr. McDonald noted that Claimant had a euthymic mood, sometimes escalating to mild anger. (*Id.* at 499.) During that session, Claimant told Dr. McDonald about an incident that occurred at Tyson where he got angry at his supervisor and "was very intimidating to him." (*Id.* at 498) Claimant stated that he left his job because he thought he would hurt someone secondary to his anger and acknowledged having thoughts of hurting others at times. (*Id.*)

Claimant's argument that the ALJ failed to "note and consider" Dr. McDonald's PCL-5 scoring is without merit. The ALJ was not required to cite every piece of evidence in the record and his failure to cite specific evidence does not indicate that the evidence was not considered. *Wildman*, 596 F.3d at 966. Moreover, although the ALJ did not discuss the results of the PCL-5, the ALJ cited to the page containing the PCL-5 in his

38

decision, which is evidence that he read and considered the PCL-5. (AR at 16 (citing 9F, pages 4-16).)

As previously discussed, Dr. McDonald only saw Claimant three times. During that limited amount of time, however, Claimant discussed an incident when he had a violent feeling towards a supervisor and was "intimidating" to the supervisor. Thus, based on her brief experience with Claimant, Dr. McDonald had support for finding that Claimant would have severe difficulty taking instruction or criticism from supervisors. Therefore, I conclude that this factor weighs very slightly in favor of finding the opinion somewhat more persuasive than "unpersuasive," but only regarding this limitation.[15]

### 2.    *Consistency*

"The more consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] . . . will be." 20 C.F.R. § 404.1520c(c)(2); 20 C.F.R. § 416.920c(c)(2).

### a.    *The Parties' Arguments*

Claimant asserts that the ALJ's analysis was erroneous for the same reasons that his analysis of Drs. Maassen and Conditt's opinion was erroneous: (1) the ALJ relied on his own interpretation of mental status examination findings and (2) inferred the ability to work from limited daily activities. (*Id.* at 13-14 (citing *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003) for the proposition that an ALJ "may not draw upon his own inferences from medical reports").)

---

[15] The Commissioner asserts the following:

> Without elaborating, Dr. MacDonald stated that plaintiff had low frustration tolerance and anger control issues (Tr. 520). But Dr. MacDonald's treatment notes from March 2019 record a euthymic mood that "sometimes escalated to *mild* anger (Tr. 499) (emphasis added). The contrast between anger control issues and a mood that, at most, escalated to mild anger cannot be ignored.

(Doc. 14 at 21.) The Commissioner failed to look behind the mental status examination at the accompanying treatment note, which was cited by the ALJ (AR at 16), if not Claimant.

Claimant also argues that the ALJ's failure to adequately explain why he found Dr. McDonald's opinion unpersuasive was harmful because "Dr. McDonald's opinions are disabling per the vocational expert testimony." (*Id.* (citing AR at 53; *Lucus v. Saul*, 960 F.3d 1066, 1069 (8th Cir. 2020).) Finally, Claimant asserts the following:

> The ALJ's failure to explain how persuasive he found the opinions of Dr. Oleskowicz and the agency nonexamining psychological consultants even further shows the ALJ was rejecting the opinions of Dr. McDonald and Dr. Conditt to draw his own inferences from the mental status examination findings. If the ALJ was going to reject or ignore the available medical opinion evidence, the ALJ had to further develop the record to determine how Mr. Foster's mental impairments limited his ability to engage in work-related activities. *See Lauer v. Apfel*, 245 F.3d 700, 706 (8th Cir. 2001).

(*Id.*)

The Commissioner responds that "the ALJ contrasted Dr. MacDonald's [sic] opinion with other normal observations during the few times she saw plaintiff for treatment." (citing AR at 18; *Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015); *Nowacki v. Colvin*, 2015 WL 2401419 *2 (W.D. Mo. May 20, 2015) (discrepancy between psychologist's treatment notes and opinion justified the ALJ discounting the opinion).) The Commissioner also argues that "[w]ithout acknowledging Dr. MacDonald's [sic] normal observations during treatment, as opposed to [his] dire evaluation, plaintiff suggests that when the ALJ weighed the discrepancy, he 'erred by relying on his own inferences.' . . . . However, the regulations direct the ALJ to weigh whether a medical opinion is supported by and consistent with the record, and that is what the ALJ did here, discussing his reasoning in detail." (Doc. 14 at 21 (citing 20 C.F.R. §§ 404.1520c(c)(1), (2)).) (*Id.*)

### b.    Analysis

In addition to the reasons specific to Dr. McDonald's opinion—that her opinion was not supported by her treatment notes documenting normal mental status

observation—the ALJ relied on the "same rationale" to discount Dr. McDonald's opinion as he did to discount Drs. Maassen and Conditt's opinion. (AR at 18.) After reviewing Dr. McDonald's opinion, I find that for the reasons articulated above in part III.C, *supra*, I recommend that the ALJ's decision regarding lack of support for the opinion from other evidence in the record should be affirmed.

That being said, I will briefly address evidence related to Claimant's anger and ability to taking instruction or criticism from supervisors. No other healthcare provider mentioned that Claimant exhibited anger in a work setting. The ALJ relied on medical evidence spanning more than two years and the only piece of evidence that mentioned anger was Dr. McDonald's opinion. (*Id.* at 16 (citing AR 354, 397-98, 407, 449, 490, 495, 499, 509, 533, 537, 544, 553, 564, 571, 575).)[16] The evidence demonstrates that rather than having problems with supervisors in general, Claimant had issues with the stress of his job at Tyson. As the ALJ noted, Claimant's function report stated that Claimant's mental health symptoms "caused [him] to not be able to work as a supervisor [at] Tyson. The hours (long days) and amount of days in a row in a loud environment, lots of pressure dealing with staff and management, . . . . smells, . . . [and] that they wouldn't let [him] step down as a supervisor." (*Id.* at 15.) The Commissioner also noted that the ALJ cited AR 547 (11F, page 22), which states that at the time the treatment note was written, Claimant was on leave from Tyson because he became overwhelmed by all the stimuli at Tyson, which caused panic attacks. (Doc. 14 at 10 (citing AR 547).) Thus,

---

[16] Claimant testified that he easily gets angry with people, but "subdue[s]" himself and removes himself from the situation when that occurs. (AR at 47.) This statement, like Dr. McDonald's opinion, is not supported by the years of mental health treatment notes in the record. Moreover, even if Claimant does feel anger towards others, his ability to properly manage the feelings indicates they would not be a problem in a work setting. "A claimant's RFC is the most [he] can still do despite [his] limitations." *Swink v. Saul*, 931 F.3d 765, 769 (8th Cir. 2019) (alterations in original).

even though Dr. McDonald had reason to raise this issue based on her few sessions with Claimant, the years of evidence in the record discussed above supports the ALJ's decision on this issue.

*Shontos v. Barnhart*, 328 F.3d 418 (8th Cir. 2003), cited by Claimant, can also be distinguished from this case. In *Shontos*, the ALJ mistakenly equated the fact that the claimant "did better" while on her mental health medications—as demonstrated by her abilities to "smile and laugh at times," appear calmer than she previously had, and sleep better—negated an opinion that the claimant would have difficulty with detailed instructions. *Id.* at 427. *Shontos* held that the ALJ improperly drew inferences from the medical records. *Id.* Here, on the other hand, the ALJ followed the evidence and found that Claimant did not have memory, concentration, or anger difficulties as demonstrated by years of mental health examinations that stated as much.

Claimant also argues that the ALJ's failure to adequately explain why he found Dr. McDonald's opinion unpersuasive was harmful because "Dr. McDonald's opinions are disabling per the vocational expert testimony." (*Id.* (citing AR at 53; *Lucus v. Saul*, 960 F.3d 1066, 1069 (8th Cir. 2020).) AR 53 contains the second hypothetical the ALJ proffered to the VE and incorporates some of Dr. McDonald's limitations, such as the hypothetical person being off task 15-20% of the day, being unable to consistently adapt to even simple changes in a work setting, and having to leave work early at least two or three days per month.[17] The VE testified that a person with these limitations would be unemployable. (*Id.*) The ALJ, however, did not find that Claimant had these limitations.

_____

[17] It is unclear where in the record the ALJ found the last limitation in this hypothetical. If he based the hypothetical on Dr. McDonald's opinion, which it seems he largely was, Dr. McDonald opined that Claimant's impairments would never cause him to be absent from work, although she put a question mark beside that check box. (AR at 522.) There were check boxes for one, two, three, four, and more than four days absent per month, but Dr. McDonald did not check any of those boxes. (*Id.*)

42

As the parties noted, the VE's first hypothetical became the RFC. (Doc. 12 at 4.) And, as thoroughly explained above, the ALJ properly explained his reasons for his decision and cited to the record to support it. (AR at 14-18.)

Claimant's argument that "[i]f the ALJ did not believe the professional opinions available, the ALJ should have further developed the record to determine the degree to which [Claimant's] mental impairments limited his ability to engage in work-related activities," is not in concert with the rules, which do not require an ALJ's decision be supported by opinion evidence, let alone, specific opinion evidence. *See Hensley*, 829 F.3d at 932 (holding that medical evidence can support an ALJ's decision). Here, the ALJ cited medical evidence that undermined the opinion evidence. In this way, the instant case can be distinguished from *Lauer v. Apfel*, 245 F.3d 700, 706 (8th Cir. 2001), cited by Claimant.

*Lauer* found that even if the ALJ properly explained why he did not give controlling weight to the opinions of the claimant's treating psychiatrists, medical evidence did not support the ALJ's conclusions regarding the severity of the claimant's mental limitations. 245 F.3d at 704. *Lauer* held that the ALJ's opinion was "unclear as to the medical basis, if any, for his assessment of the degree to which Mr. Lauer's mental impairments affected his RFC," stating that much of the evidence was based on evidence provided by health care professionals who were not mental health specialists. *Id.* at 705. The court found it significant that although the ALJ ordered a psychiatrist to administer three tests to the claimant after the close of testimony and before the ALJ rendered his decision, the ALJ "rejected . . . virtually all of Dr. Henze's analysis of the test results and never submitted the test results to the medical advisor or to any other professional for review." *Id.* at 705-06. Here, as discussed above, the ALJ relied on numerous mental health assessments administered over more than two years. (AR at 16, 18.)

Lastly, Claimant's argument that the ALJ somehow purposely failed to explain how persuasive he found Dr. Oleskowicz's and the state agency reviewing psychiatrists' opinions as part of some kind of grand plan to allow him to reject the opinions of Dr. McDonald and Drs. Maassen and Conditt "to draw his own inferences from the mental status examination findings" is without merit. As previously explained, the ALJ was not required to assess Dr. Oleskowicz's C&P report, and while remand is required for the ALJ to properly evaluate the opinions of the state agency reviewing psychiatrists, there is no evidence that the ALJ's failure to analyze their opinions was anything but an oversight.

This factor weighs in favor of finding Dr. McDonald's opinion unpersuasive.

### 3. Conclusion

Although the first factor weighed slightly in favor of finding Dr. McDonald's opinion somewhat more persuasive, I recommend the District Court affirm this part of the ALJ's decision.

### E. Whether the ALJ Properly Evaluated Claimant's Subjective Complaints

### 1. Relevant Law

When a claimant suffers from a severe impairment, but the impairment does not meet or equal a disabling impairment listed in the regulations, the ALJ "will consider the impact of [the claimant's] impairment(s) and any related symptoms, including pain, on [the claimant's] residual functional capacity." 20 C.F.R. § 404.1529(d)(4). This determination involves a two-step process in which the ALJ first decides whether the claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms and then evaluates the intensity and persistence of the claimant's symptoms. *Id.* § 404.1529(b),(c). When evaluating the claimant's subjective complaints during the second step, the ALJ considers the objective medical evidence, the claimant's work history, and evidence relating to the following factors ("the *Polaski*

factors"): (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) [the claimant's] functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3).[18] An ALJ is not required to methodically discuss each *Polaski* factor as long as the ALJ "acknowledge[s] and examin[es] those considerations before discounting [a claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)).

After considering the factors and evidence, the ALJ determines the extent to which the claimant's symptoms affect the claimant's capacity to perform basic work activities. *Id*. § 404.1529(c)(4). The claimant's "symptoms, including pain, will be determined to diminish [the claimant's] capacity for basic work activities to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.*

   2.   *Analysis*

For the most part, Claimant reiterates his arguments that "the ALJ erred by drawing his own inferences from the mental status examination finding in the face of the examination opinions of Dr. Conditt and the treating opinions of Dr. McDonald". . . . , "faili[ng] to provide good reasons for finding the opinions from Dr. Conditt and Dr. McDonald unpersuasive". . . . and failing to address the opinions of Dr. Oleskowicz and

---

[18] The Code of Federal Regulations includes the additional factors of: (1) other treatment the claimant receives for pain relief; and (2) measures the claimant uses to relieve pain "(e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.)." 20 C.F.R. § 404.1529(c)(3)(v),(vi).

the state agency reviewing psychiatrists. (Doc. 13 at 16-17.) Those arguments have already been addressed. Claimant makes one new argument based on his daily activities.

Claimant asserts that the ALJ did not discuss the difficulties he had with daily activities. (*Id.* at 15.) Specifically, Claimant states that nearly all of his activities are done "from the comfort of [his own] home and that he does not go out very often." (*Id.* at 14-15 (citing AR at 16, 234).) Claimant also relies on the third-party function report by VA worker Theresa Stoker who noted that Claimant does not like loud noises or crowds due to his PTSD. (*Id.* at 15 (citing AR 223).) Ms. Stoker also noted that Claimant sits in the back at church to protect his children and himself and Claimant states that by the time of his hearing, he stopped attending church. (*Id.* (citing AR 50, 222).) Therefore, Claimant argues that his daily activities are consistent with his reported limitations, including his statement to Dr. Conditt that he stays in his house 95% of the time. (*Id.* at 16.)

The Commissioner contends that Claimant's daily activities "were worthy of consideration" and notes that the ALJ cited a treatment note where Claimant stated he planned to take his children biking in the morning and to the pool in the afternoon during the summer. (Doc. 14 at 13-14 (citing AR 16, 395-96).) The Commissioner also cites a July 5, 2018 treatment note where Claimant stated he took his children to the pool. (*Id.* at 14 (citing AR 405).) In addition the Commissioner argues that Claimant's abilities to drive a car, manage his finances, do household repairs and yardwork, indicate, as the ALJ stated, "the ability to perform unskilled, socially limited work that involves only simple, work-related decisions." (*Id.*)

Although Claimant limits his time away from home, leaving home is not a trigger for Claimant's PTSD or panic attacks. Work, itself, is also not a trigger. In fact, most of the pages Claimant cited in support for his arguments related to this issue and to show

his history of mental health treatment[19] do not support an argument that Claimant is not unable to leave the house, but only that his old job stressed him.  (*See* AR 572 (Claimant "requesting letter to work to either decrease his responsibility as supervisor and go back to  hourly or that he can stay" at current schedule. . . . Claimant does not want to continue to work 6 days/week "due to his kids.  Too much stress and anxiety due to this"); (568-69 ("He states he is in charge of supervising maintenance department, however many of them do not come in skilled. Makes it very difficult to complete his job. He states the pressure between his manager and getting the job done is becoming unbearable and he is not sure the job is worth it."); 549-50 ("Anxiety is good as long as he is not at work . . . . He is unable to return to his place of employment."); 351 (Claimant left his job at Tyson because they would not work with him and he felt it was better to resign); 395 (Claimant stated he planned to take children swimming and biking in the summer and Ms. Kubik encouraged him to volunteer, do activities, and stay active); 489 (Claimant does not go to church anymore because he fears church shootings); 395 (Claimant spending time biking, swimming, and trying to "cook well" for his kids; reports that any irritability he feels is controlled).)  The other pages cited by Claimant are treatment notes, but do not appear to contain any relevant information.

In conclusion, although Claimant is most comfortable at home, nothing in the record indicates that the ALJ failed to properly evaluate Claimant's credibility related to his daily activities.  *See Hacker*, 459 F.3d at 936 (decision is not outside acceptable zone of choice simply because the court might have reached a different decision).

I recommend the District Court affirm this part of the ALJ's decision.

---

[19] Claimant cites AR 572, 568, 561, 560, 550, 549, 539, 534, 530, 351, 336, 395, 404, 430, 417, 489, 491, 497, 506, and 517.

*F.*     *Whether the ALJ Failed to Support his Step Five Denial with Substantial Evidence*

   *1.*     *Relevant Facts*

The arguments on this issue present a unique situation. The parties ostensibly present "step 5" arguments. However, at step five, the ALJ considers whether the claimant has the "*RFC to perform a significant number of other jobs in the national economy that are consistent with [his] impairments and vocational factors such as age, education, and work experience.*" *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015) (emphasis added) (quoting *Phillips v. Astrue,* 671 F.3d 699, 702 (8th Cir. 2012)).

In relevant part, the RFC in this case states Claimant has

> the ability to understand, remember, and complete only simple, routine tasks.

(AR at 14.) The relevant hypothetical presented to the VE contained the same limitations. (*Id.* at 52.)

Although the ALJ did not limit Claimant to "unskilled work" in the RFC, five times in the decision, he stated Claimant was only capable of "unskilled work." (*Id.* at 15-16, 19.) One of the times he mentioned unskilled work, the ALJ referred to the RFC. (*Id.* at 15 (noting that the record provides "strong evidence of an ability to perform unskilled socially limited work as described in the above-listed [RFC]").) In addition, in the decision, the ALJ stated that Claimant had the ability to "learn, recall, and use the instructions necessary to carry out the one- and two-step tasks associated with unskilled work." (*Id.* at 16.) However, the ALJ did not incorporate "one-to-two step tasks" into the RFC or the hypotheticals he presented to the VE at the hearing. (*Id.* at 14, 52.)

   *2.*     *The Parties' Arguments*

Despite the fact that "one-and-two step tasks" and "unskilled work" were not stated in the RFC and were not part of the hypothetical presented to the VE, Claimant

argues as if the terms were part of the RFC. Claimant first argues that the ALJ failed to support his step five denial, "given that the ALJ thought he was limiting [Claimant] to 'one and two-step tasks.'" (Doc. 13 at 17.) Claimant asserts that

> The ALJ explained that when Mr. Foster's activities are considered "with his mental status exams and lack of regular counseling, these activities show the claimant can learn, recall, and use the instructions necessary to carry out the one and two-step tasks associated with unskilled work."

(*Id.* (citing AR 16).) Claimant argues that "[t]he ALJ erred in assuming all unskilled work involves only the performance of one and two-step tasks—only Reasoning Level 1 jobs per the Dictionary of Occupational Titles fit that bill." (*Id.* (citing, *inter alia*, *Burns v. Saul*, No. 18-cv-72-LTS-MAR (N.D. Iowa Jan. 10, 2020) (finding a one-to-two-step-commands limitation was inconsistent with Reasoning Level 2 or 3 work); Doc. 15 at 4 (citing *Stanton v. Comm'r, Soc. Sec. Admin.*, 899 F.3d 555, 560 (8th Cir. 2018) ("court recognized that the ALJ's reference to '1 to 2 step tasks' corresponded to Level 1 Reasoning, creating a conflict between the [VE's testimony, identifying a Level 3 job] and the Dictionary").) Accordingly, Claimant argues that the ALJ erred by relying on Reasoning Level 2 jobs to deny his claim. (*Id.* at 17-18 (noting that Packager, Machine, ("packaging machine operator"), 1991 WL 687942, and Cook Helper, 1991 WL 672752, are both Reasoning Level 2 jobs).)

Claimant also argues that the jobs relied on by the ALJ are also not appropriate because loud noises are a trigger for his PTSD and contributed to his inability to perform his last job. (*Id.* at 18 (citing AR 43, 48).) Although Machine Feeder, 1991 WL 678871, is a Reasoning Level 1 job, it is also a Noise Level 4 (loud) job, as is packaging machine operator. (*Id.* at 17-18.) Therefore, according to Claimant, no jobs cited by the ALJ are appropriate for him and the case must be remanded for the ALJ to present a new hypothetical to the ALJ.

49

The Commissioner responds that Claimant incorrectly interprets the ALJ's "isolated reference to [Claimant's] ability to 'use the *instructions* necessary to carry out the *one and two-step tasks* associated with unskilled work.'" (Doc. 14 at 22.) The Commissioner argues that this comment did not mean "the ALJ was tied to jobs with a reasoning level of one (R1)." (*Id.*) The Commissioner notes that the R1 definition does not use the word "task," but means a worker can "[a]pply commonsense understanding to carry out simple one- or two-step *instructions*. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." (*Id.* at 22-23 (quoting the *Dictionary of Occupational Titles*, App. C, 1991 WL 688702).) The Commissioner continues, "R2 requires, in relevant part, that the employee, 'apply commonsense understanding to carry out detailed but uninvolved written or oral *instructions*.'" (*Id.* at 24.)

The Commissioner argues that not only was the ALJ's statement not part of the RFC, the ALJ did not say that Claimant was limited to performing jobs with one-to-two-step instructions. (*Id.*) The Commissioner asserts the following argument:

> A companion publication to the *Dictionary* does not define instructions but does define a task as:
>
>> one or more elements. It is a distinct activity in the logical and necessary steps or work performed by an individual. Any human effort, physical or mental, exerted to accomplish a specific purpose is a task.
>
> *Selected Characteristics of Occupations Defined in the Revised Dictionary* ("*SCO*"), Collection and Aggregation of Data, pg. x (Dept. of Labor 1991), at SelectedCharacteristicsSearch121110.pdf (wnylc.net) (last accessed July 7, 2021).
>
> The *Dictionary* also does not define "instructions" but does use it interchangeably with "orders." App. B, 1991 WL 688701 ("clarification of instructions or orders"). Therefore, instructions are directions or orders,

> and tasks are the actions that make up a position and then a job. *Id.*; *SOC* at pg. x. An order is not an action . . . .

(*Id.* at 24-25.)

The Commissioner goes on to quote definitions of "tasks" and "orders," which is a word used interchangeably with "instructions" in the *Dictionary*, from the *Dictionary's* companion publication, *Selected Characteristics of Occupations Defined in the Revised Dictionary* ("*SCO*"). The Commissioner concludes that (1) "instructions" are directions or orders and (2) "tasks" are the actions that that make up the positions of a certain job. (*Id.*) The Commissioner also notes that *Burns* did not address this difference.

The Commissioner further argues that none of the ALJ's other descriptions of abilities, including in the RFC, mentioned a certain number of tasks, which, according to the Commissioner, "further argues against Claimant's claim that the ALJ . . . misunderstood the regulations." (*Id.* at 24.) Rather, the Commissioner asserts that the ALJ never limited Claimant to jobs involving only one- and two-step tasks. The Commissioner notes the following:

[1]     The ALJ stated that the evidence suggested that plaintiff "can engage in unskilled, socially limited jobs, without exertional accommodations" (Tr. 15).

[2]     When discussing plaintiff's activities, the ALJ observed, "While not indicative of an absence of functional limitations, these activities denote the ability to perform unskilled, socially limited work that involves only simple, work-related decisions" (Tr. 16).

[3]     Later, the ALJ found the evidence showed an "ability to perform unskilled, socially limited work as described in the above-listed residual functional capacity assessment" (Tr. 19).

[4]     The ALJ's formal residual functional capacity does not limit plaintiff to one and two-step tasks and one and two-step tasks were not part of the hypothetical question the ALJ posed to the vocational expert (Tr. 14, 52).

51

[5]     The ALJ accepted the vocational expert's opinion that plaintiff could
        work in the unskilled jobs of packaging machine operator, machine
        feeder, and cook's helper (Tr. 20).

(*Id.* at 24 (numbering and formatting added).)   The Commissioner notes that SSA regulations required the ALJ to take administrative notice of the *Dictionary's* reliable job information regarding unskilled work, "which discusses 'instructions' but not 'tasks.'" (*Id.* (citing 20 C.F.R. § 404.1566(d)(1)).)

### 3.     Clarifying the RFC

First, as discussed above, although the ALJ stated Claimant was capable of "unskilled work" five times and that Claimant could "learn, recall, and use the instructions necessary to carry out the one- and two-step tasks associated with unskilled work," (AR at 15-16, 19), he did not limit Claimant to "unskilled work" in the RFC or hypotheticals presented to the VE. (*Id.* at 14, 52.) The RFC and relevant hypothetical only mentioned, in relevant part, "the ability to understand, remember, and complete only simple, routine tasks." (AR at 14, 52.) Reading the RFC together with the rest of the opinion in an attempt to harmonize the decision as I must, I find that the ALJ incorporated his "unskilled work" and "one- and two-step tasks" holdings into the RFC by using the language quoted above. *See Chismarich v. Berryhill*, 888 F.3d 978, 980 (8th Cir. 2018) ("[W]e must view the record in the light most favorable to the [ALJ's] determination. . . . we must strive to harmonize statements where possible; we may neither pick nits nor accept an appellant's invitation to rely upon perceived inconsistencies.").

This Court faced a similar situation in *Bantz v. Berryhill*:

As an initial matter, although the ALJ did not explicitly limit Bantz to unskilled work in his RFC description, he suggested Bantz could only perform unskilled work throughout his discussion of Bantz's RFC: the ALJ stated that the overall record "suggest[ed Bantz] could have performed light, unskilled work, with additional postural, manipulative, and social accommodations" (AR 22); that Bantz's activities of daily living "suggest

52

she could be around others outside her home while understanding, remembering, and carrying out the two and three-step tasks associated with unskilled work" (AR 24); and that the state agency consultants "also" (i.e., like the ALJ) found Bantz "capable of light, unskilled work" (AR 25). In addition, all four positions the ALJ found Bantz could perform—counter clerk, parking lot attendant, restroom attendant, and conveyer line tender—involve unskilled work. AR 26, 73. Unskilled work is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568. Thus, a limitation to unskilled work encompasses a limitation to "simple, repetitive tasks." *See Hosch v. Colvin*, No. C15-2014-CJW, 2016 WL 1261229, at *5 (N.D. Iowa Mar. 30, 2016) (noting unskilled work involves "simple, routine, repetitive tasks"); *see also Freeman v. Colvin*, No. 13-5108, 2014 WL 4467265, at *1 (W.D. Ark. Sept. 10, 2014) (noting the ALJ recognized an ability "to perform simple, repetitive tasks" is "tantamount to unskilled work"); *Brown v. Astrue*, No. 10-03113-CV-S-DGK, 2011 WL 2582555, at *2 (W.D. Mo. June 29, 2011) (noting the ALJ recognized the ability to perform "simple repetitive tasks" is "commensurate with unskilled work activity"); *Strang v. Barnhart*, No. C04-4037-MWB, 2005 WL 1500844, at *11 (N.D. Iowa June 23, 2005) (noting the ALJ recognized the ability "to perform simple, repetitive tasks on a sustained basis [ is] consistent with unskilled work activity") (report and recommendation). Even if the ALJ erred by not explicitly including a limitation to "unskilled work" or "simple, repetitive tasks" in the RFC, he nevertheless identified jobs that a person with those limitations could perform, and any error in failing to include a limitation to "simple, repetitive work" is therefore harmless. *See Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) (declining to reverse an ALJ's decision where "even if the ALJ had not erred, there [was] no indication that the ALJ would have decided differently").

No. 17-CV-00002-LRR, 2018 WL 3078111, at *6 (N.D. Iowa Feb. 22, 2018), *R. & R. adopted,* 2018 WL 1522693 (N.D. Iowa Mar. 28, 2018).

The phrase "simple, routine tasks" is synonymous with "unskilled work." *See Walker v. Berryhill*, No. 4:16-CV-04039, 2017 WL 2414845, at *2 (W.D. Ark. June 2, 2017) (noting in RFC "simple, routine tasks," among other things, were consistent with

the definition of "unskilled work as defined in SSR 85-15"); *Robinson v. Berryhill*, No. 4:17-CV-02706-AGF, 2019 WL 1200428, at *6 (E.D. Mo. Mar. 13, 2019) (VE testimony that "simple routine tasks" is the usual definition of "unskilled work"). Moreover, by referring to "the one and two-step tasks associated with unskilled work," I find that the ALJ also incorporated that limitation into the RFC.

While the ALJ could have avoided this interpretation problem by incorporating this language into the RFC, the consistent references to unskilled work, the reference to the tasks associated with unskilled work, and a reference to the RFC that mentions unskilled work show that the ALJ meant to incorporate "unskilled work" and "the one and two-step tasks associated with unskilled work," into the RFC despite the use of imprecise language. Furthermore, like *Bantz,* I find that any error for failing to include the limitation in the RFC was harmless because one job the ALJ identified is in concert with those limitations.

Second, *Thomas v. Berryhill* addresses the Commissioner's "tasks vs. instructions" arguments. 881 F.3d. 672 (8th Cir. 2018). I have found that the ALJ incorporated his unskilled work and one-and two-step tasks holdings into the RFC. *Thomas* held that an RFC that limited a claimant to performing "1 to 2 step *tasks*" limited the claimant to jobs requiring Level 1 reasoning. *Id*. at 677 (emphasis added). Level 1 reasoning requires workers to do the following: "Apply commonsense understanding to carry out simple one- or two-step *instructions*. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." App. C to *The Dictionary of Occupational Titles*. Thus, "tasks" and "instructions" are synonymous in this instance.

### 4. *Reasoning Level 2 Jobs*

The ALJ stated, "[W]hen considered with his mental status exams and lack of regular counseling, [Claimant's] activities show the claimant can learn, recall, and use

the instructions necessary to carry out the one and two-step tasks associated with unskilled work." (AR at 16.) Claimant argues that the ALJ erred by assuming all unskilled work involves only the performance of one-and two-step tasks. (Doc. 17 at 13.)

Claimant is correct. *Stanton v. Comm'r, Soc. Sec. Admin.* explained the following:

This court . . . long has held that before an ALJ can rely on a vocational expert's testimony that appears to conflict with a *Dictionary* listing, the ALJ must identify and resolve the conflict. Otherwise, the vocational expert's testimony is not substantial evidence to support a denial of benefits. *See Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997); *Montgomery v. Chater*, 69 F.3d 273, 276 (8th Cir. 1995). In 2000, the Commissioner adopted this rule as its own in Social Security Ruling 00-4p, and we have continued to apply it. Whether the vocational expert's testimony is substantial evidence in support of the ALJ's decision thus depends on whether the expert's testimony appears to conflict with the *Dictionary*, and if so, whether the ALJ resolved the conflict.

899 F.3d 555, 558 (8th Cir. 2018).

*Stanton* held

The vocational expert's testimony in this case appears to conflict with the Dictionary [of Occupational Titles]. According to the Dictionary, the job identified by the vocational expert—hospital or industrial cleaner—requires a worker to employ Level 2 Reasoning. Dictionary of Occupational Titles 381.687-018, at 282. Level 2 Reasoning, in turn, requires a worker to "[a]pply commonsense understanding to carry out one- or two-step instructions" and to "[d]eal with standardized situations with occasional or no variables in or from those situations encountered on the job." *Id.*

The hypothetical posed by the ALJ to the vocational expert and the ALJ's final residual functional capacity determination both limit Stanton to Level 1 Reasoning. At the hearing, the ALJ's hypothetical limited Stanton to the ability "to understand, retain and carry out simple one to two step instructions." Similarly, the ALJ ultimately found that Stanton's residual functional capacity was limited to the ability "to understand, retain and carry out simple one- to two-step instructions." These statements correspond directly to language used by the Dictionary to describe Level 1 Reasoning: "Apply commonsense understanding to carry out one- to two-

step instructions." *Id.*; *see also Thomas*, 881 F.3d at 677. Thus, when the vocational expert testified that someone with Stanton's limitations could perform the job of hospital or industrial cleaner, he testified that someone limited to Level 1 Reasoning could perform a job that the Dictionary describes as having an approximate maximum requirement of Level 2 Reasoning.

*Id.* at 558-59; *see also Burns v. Saul*, No. 18-cv-72-LTS-MAR, slip op. at 15-16 (N.D. Iowa Jan. 10, 2020) (holding that the ALJ erred by failing to adopt the one-to-two-step instructions limitation from an opinion the ALJ gave great weight and found consistent with the record as a whole, which was "a greater limitation than the limitation to simple instructions included in the final RFC").

Claimant is correct that only Reasoning Level 1 jobs suffice for one-and-two-step tasks. Both *Stanton* and *Burns* so hold. Thus, if the VE in this case had been presented with a hypothetical that contained a one-and-two step limitation, Claimant would be correct that the packaging machine operator and cook helper, which both required Reasoning Level 2, would be unresponsive to the hypothetical and inappropriate for Claimant. The problem with this argument is that the VE was not presented with a hypothetical that contained such a limitation.

Both *Stanton* and *Burns* distinguish the hypotheticals in those cases from the hypothetical in *Moore v. Astrue*, 623 F.3d 599, 604 (8th Cir. 2010) because the hypothetical in *Moore* did not limit the hypothetical claimant to work involving one-to-two step instructions. *Stanton*, 899 F.3d at 559 ("*Moore* emphasized that the ALJ decision at issue did not limit job instructions 'to simple *one- or two-step* instructions' or otherwise indicate that Moore could perform only occupations at a [Dictionary] Level 1 reasoning level.") (citing *Moore*, 623 F.3d at 604); *Burns*, No. 18-cv-72-LTS-MAR, slip op. at 16 ("RFC limitation to simple instructions could be consistent with jobs having a

reasoning level higher than one, whereas limitation to one-or-two-step instructions is consistent only with reasoning level one jobs) (citing *Moore*, 623 F.3d at 604).

The hypothetical and RFC in this case state, in pertinent part, that Claimant has "the ability to understand, remember, and complete only simple routine tasks." (AR at 14, 52.) The only mention of a one-to-two step limitation is in the decision where the ALJ stated that Claimant's activities show that he "can learn, recall, and use the instructions necessary to carry out the one and two-step tasks associated with unskilled work. They further indicate an ability to sequence those tasks appropriately, ask and answer questions, and use reason and judgment to make work-related decisions."

While the VE could fairly assume that a hypothetical limiting a person to simple, routine tasks limits that person to unskilled work, the VE could not assume that unskilled work limited the hypothetical person to one-to-two step tasks because unskilled work can encompass jobs that involve more than one-to-two step tasks. *See Bantz*, 2018 WL 3078111, at *6-7 (noting that ALJ stated that the claimant's activities of daily living suggested she could carry out "the two and three-step tasks associated with unskilled work," and recommending the district court affirm the ALJ's decision); *Ricard v. Colvin*, No. C15-4046-LTS, 2016 WL 2770531, at *7 (N.D. Iowa May 13, 2016) ("ALJ properly determined that claimant could perform unskilled jobs, involving three to four step tasks on a sustained basis"), *R. & R. adopted,* 2016 WL 4926433 (N.D. Iowa Sept. 15, 2016).

As discussed above, the ALJ found Claimant's limitations supported a finding that he was limited to performing jobs that involved one-to-two step tasks, but then failed to incorporate that limitation into the hypothetical and RFC. This is similar to the situation in *Burns* where the ALJ found a certain medical opinion supported by the record but failed to incorporate all the limitations in the opinion into the RFC. *Burns*, No. 18-cv-72-LTS-MAR, slip op. at 14-15. And, as in *Burns*, the alleged error caused the VE to

recommend jobs that required Reasoning Level 2, when Claimant was capable only of Reasoning Level 1 jobs. *See id.* at 17 ( "On remand, the ALJ should either (1) include the one-to-two step limitation in Burns' RFC or (2) explain why omitting such a limitation is justified.") Thus, unless good cause exists not to do so, the case should be remanded for a new step five evaluation.

### 5. *Noise Limitation*

In the instant case, the VE cited one job requiring Reasoning Level 1, machine feeder. Claimant asserts this job is inappropriate because it has a noise level 4 (loud) and loud noises trigger his PTSD. (Doc. 13 at 18.) Claimant notes that "loud noises contributed to his inability to perform his last job." (*Id.* (citing AR 15 (ALJ decision)).)

Claimant cites to the page of the ALJ's decision that states, in pertinent part, that Claimant had to leave his job at Tyson because of "[t]he hours (long days) and amount of days in a row in a loud environment, lots of pressure dealing with staff and management." (AR 15.) Claimant testified that loud noises, loud music, and barking dogs are triggers for his PTSD and panic attacks. (AR at 43-44, 48.)

In order to constitute substantial evidence, a vocational expert's testimony must be based on a hypothetical that captures the "concrete consequences" of the claimant's deficiencies. *Scott v. Berryhill,* 855 F.3d 853, 857 (8th Cir. 2017) (citing *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) (quotation omitted); *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997)). The hypothetical in this case did not include a limitation related to noise level. However, the ALJ was only required to include in the hypothetical the impairments he found supported by the record. *Goff v. Barnhart*, 421 F.3d 785, 794 (8th Cir. 2005) ("A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true.") (quoting *Hunt v. Massanari,* 250 F.3d 622, 625 (8th Cir. 2001)). The lack of a

noise limitation in the hypothetical and eventual RFC indicates that the ALJ in this case did not find the evidence supported a noise limitation.

The question then becomes whether the ALJ should have included such a limitation. The Commissioner asserts that a noise limitation was not necessary, noting that Claimant owned a dog and mowed his lawn. (Doc. 14 at 25 (citing AR at 233, 235).) The Commissioner also asserts that Claimant is unlikely to find loud music, fireworks, and barking dogs in a work environment and therefore the things that trigger Claimant's PTSD and panic attacks are not at issue in the workplace. (*Id.* (citing AR at 43, 337).)

The ALJ found all opinion evidence unpersuasive. In so doing, he focused on the opinion-writers' mental health examinations and not what they said about Claimant's hearing, if anything. While Dr. McDonald stated that Claimant would experience interference from his PTSD symptoms, she did not mention what triggered his PTSD. (AR at 520-21.) Claimant told Drs. Maassen and Conditt that he did not like crowds and fireworks. (*Id.* at 337.) The state agency reviewing psychiatrists noted that Claimant had been successfully employed until shortly before he filed for benefits when "noise and environment became too strong of triggers for him." (*Id.* at 68, 83, 93.) Of all the treatment notes the ALJ cited (*Id.* at 16, 18), only two accompanying narratives state that noises are triggers for Claimant's PTSD or panic attacks. (*Id.* at 535 (noting that smells and noises at Tyson were triggers for Claimant's PTSD); 545 (among other things, noise is a trigger for panic attacks).) However, other narratives accompanying the cited treatment notes support the ALJ's omission of a noise limitation from the RFC. For example, two statements accompanying cited treatment note 449, which is part of Dr. McDonald's initial intake for Claimant, say that Claimant left Tyson because of smells and long hours and that he did not like being in crowds or being around people. (*Id.* at 445, 448.) There is no notation about noise.

The ALJ also found the third-party function report of Theresa Stoker, the Clinic Manager at the VA Clinic where Claimant receives treatment, unpersuasive because she "did not appear to have any formal medical or mental health training." (*Id.* at 18.) Ms. Stoker "opined the claimant could not perform work because of PTSD, depression, and anxiety, because of the pressure of his supervisory role, long hours, and noisy environment." (*Id.* at 18, 218-25.) She also stated that Claimant does not "like crowds or loud noises due to PTSD." (*Id.* at 223.) The ALJ noted that Ms. Stoker confirmed several of Claimant's daily tasks, such as taking care of his children, doing housework, and attending church, but also noted that not only did Ms. Stoker not have "specialized healthcare training," she also "assume[d] disability because of the expectations of the claimant's last job now [sic] fall outside his functional abilities." (*Id.* at 18.) The ALJ noted that even if Ms. Stoker had the vocational specialization necessary to form such an opinion, "that would not mean the claimant now experiences a total inability to work. Regardless of his ability to meet the demands of his former occupation," the evidence in the record supported Claimant's ability to perform work as described in the RFC. (*Id.* at 18-19.) Claimant does not take exception to the ALJ's assessment of this function report.

The treatment evidence cited by Claimant and the ALJ and the opinion evidence in the record are, at most, a mixed bag. While there is some evidence in the record that loud noises trigger Claimant's PTSD, most treatment notes do not so state. Moreover, some of the evidence ties Claimant's noise issues to Claimant's job at Tyson. "[I]f the record shows two positions that are plausible and can be supported by substantial evidence, we must follow the ALJ's position and affirm his decision." *Crawford v. Colvin*, 809 F.3d 404, 408 (8th Cir. 2015) (citing *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011)). Accordingly, I find that the ALJ was justified in omitting a noise limitation from the RFC. Therefore, machine feeder is an appropriate job for Claimant.

There are 37,000 machine feeder positions in the national economy, which constitutes a significant number of jobs. *See Weiler v. Apfel*, 179 F.3d 1107, 1111 (8th Cir. 1999) (32,000 jobs in the national economy was a significant number of jobs).

### *6.    Recommendation*

Because a significant number of jobs exist in the national economy that Claimant can perform based on his current RFC, remand is not necessary for a new step five evaluation. I recommend the District Court affirm this part of the ALJ's decision.

## *IV.    CONCLUSION*

For the foregoing reasons, I respectfully recommend that the District Court **affirm in part and reverse and remand in part** the decision of the ALJ. I recommend that the District Court **reverse and remand** the case for the ALJ to conduct a proper evaluation of the state agency reviewing psychiatrists' opinions under 20 C.F.R. § 404.1520c(b)(2) and explain how persuasive he finds the opinions and **affirm** the ALJ's decision in all other respects as discussed above.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 24th day of January, 2022.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa

61